UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAPA EXTRUSIONS, INC. f/k/a ALCOA EXTRUSTIONS, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| LIBERTY MUTUAL INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., GERLING KONZERN ALLEGEMEINE VERSICHERUNGS-AG a/k/a GERLING KONZERN GENERAL INSURANCE COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY, ACE AMERICAN INSURANCE COMPANY, ARCH SPECIALTY INSURANCE COMPANY f/k/a ROCK RIVER INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY, and INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, | : NO.  : : : : : : : **JURY DEMAND** : : : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT

AND NOW, Plaintiff Sapa Extrusions, Inc., formerly known as Alcoa Extrusions, Inc.

("Sapa"), by and through its undersigned counsel, hereby files this Complaint in support thereof

avers as follows:

## THE PARTIES

1.      Plaintiff Sapa Extrusions, Inc., formerly known as Alcoa Extrusions, Inc., is a

Delaware corporation with its principal place of business at 9600 W Bryn Mawr Avenue,

Rosemont, IL  60018.  Plaintiff does business in the Commonwealth of Pennsylvania, including operating a factory in the Commonwealth of Pennsylvania.

2.     Defendant Liberty Mutual Insurance Company ("Liberty Mutual") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

3.     Defendant National Union Fire Insurance Company of Pittsburgh, PA. ("National Union") is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  National Union is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

4.     Defendant Gerling Konzern Allegemeine Versicherungs-AG a/k/a Gerling Konzern General Insurance Company ("GKA") is a foreign corporation with its principal place of business in London, United Kingdom.  GKA issued insurance policies in the Commonwealth of Pennsylvania.

5.     Pacific Employers Insurance Company ("Pacific") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.  Pacific is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

6.     ACE American Insurance Company ("ACE") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.  ACE is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

7.     Defendant Arch Specialty Insurance Company f/k/a Rock River Insurance Company ("Arch") is a Nebraska corporation with its principal place of business in Omaha, Nebraska.  Arch is an eligible surplus lines insurance company authorized to issue insurance policies in the Commonwealth of Pennsylvania.

8.     Defendant Great American Assurance Company ("Great American") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Great American is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

9.     Defendant American Guarantee & Liability Insurance Company ("American Guarantee") is a New York corporation with its principal place of business in New York, New York.  American Guarantee is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

10.     Defendant Insurance Company of the State of Pennsylvania ("ICSOP") is a Pennsylvania corporation with its principal place of business in New York, New York.  ICSOP is authorized to issue insurance policies in the Commonwealth of Pennsylvania.

## VENUE AND JURISDICTION

11.     This Court has jurisdiction over this matter by virtue of diversity jurisdiction pursuant to 28 U.S.C. § 1332 by reason of diversity of citizenship and an amount in controversy to be in excess of $75,000, exclusive of interests and costs.

12.     The venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to this claim occurred within this district and several defendants are incorporated in the Commonwealth of Pennsylvania.

## OPERATIVE FACTS

## THE UNDERLYING ACTION

13.     The instant action is a breach of contract action against several insurance companies who sold insurance to Sapa, either through its former parent corporation, Alcoa, Inc. or as a named insured in the policies, and who have refused to defend or indemnify Sapa from the lawsuit filed by Marvin Lumber and Cedar Company and Marvin Windows of Tennessee, Inc. (collectively, "Marvin"), in the United States District Court for the District of Minnesota

3

naming Sapa as the sole defendant, and captioned *Marvin Lumber and Cedar Company and Marvin Windows of Tennessee, Inc. v. Sapa Extrusions, Inc.*, D. Minn., No. 10-cv-3881 (the "Underlying Action"). A true and correct copy of the complaint in the Underlying Action is attached hereto as Exhibit "A".

14.     In the Underlying Action, Marvin brought ten counts against Sapa, including counts of breach of contract, breach of warranty, negligent misrepresentation, and fraud stemming from Sapa's, while named Alcoa Extrusion, Inc.'s, sale of allegedly defective aluminum profiles used in windows and doors by Marvin.

15.     In the Underlying Action, Marvin alleged that the profiles were defective and that they damaged Marvin's products – aluminum sided windows and doors – of which Sapa's aluminum profiles were a component and damaged homes in which the windows and doors were installed.

16.     Marvin further alleged that it had incurred "substantial costs . . . responding to customer complaints." (Ex. A at ¶37.)

17.     Marvin further alleged that Sapa "negligently omit[ed] certain material information" regarding the coating of the profiles and that these misrepresentations led to Marvin's damages. (Ex. A at ¶80.)

18.     Marvin sought reimbursement for all of the costs incurred, including the repairing and replacing of windows and doors and repairs to the interiors of the homes damaged as a result of water intrusion.

19.     During discovery in the Underlying Action, a substantial category of damage identified by Marvin included "Interior Refinish", which was the costs Marvin incurred in repairing the interiors of homes.

20.     During discovery in the Underlying Action and in later motions, Marvin sought damages for profiles sold by Sapa to Marvin dating back to 1999.

21.     In September 2013, Sapa and Marvin entered into a confidential settlement agreement resolving the Underlying Action, which was subsequently dismissed with prejudice.

## POLICIES AT ISSUE

### Liberty Mutual Policies

22.     Liberty Mutual sold to Alcoa, Inc. a Blanket Public Liability Policy, Policy No. RG1-681-004072-017, for the policy period April 1, 1998 through July 1, 2000 (the "1998 Liberty Mutual Policy"), which provides coverage for, among other things, Property Damage Liability coverage.  A copy of the 1998 Liberty Mutual Policy is attached as Exhibit "B" and, by this reference, incorporated as though fully set forth herein.

23.     Liberty Mutual also sold to Alcoa, Inc. a Blanket Public Liability Policy, Policy No. RG1-681-004072-010, for the policy period July 1, 2000 through July 1, 2003 (the "2000 Liberty Mutual Policy"), which provides coverage for, among other things, Property Damage Liability coverage.  A copy of the 2000 Liberty Mutual Policy is attached as Exhibit "C" and, by this reference, incorporated as though fully set forth herein.  The 1998 Liberty Mutual Policy and 2000 Liberty Mutual Policy shall collectively be referred to as the "Liberty Mutual Policies".

24.     The 2000 Liberty Mutual Policy was cancelled by Alcoa, Inc. on July 1, 2001.

25.     Alcoa Extrusion, Inc. is an "insured" under the Liberty Mutual Policies, both under the definition of "Persons Insured" as a "subsidiary company" to Alcoa, Inc. and as specifically identified in the Named of Insured Endorsement in the 2000 Liberty Mutual Policy.

26.     The limit of liability under each of the Liberty Mutual Policies is $10,000,000 (ten million dollars) for each occurrence with a $30,000,000 (thirty million dollars) general aggregate and a deductible of $1,000,000 (one million dollars) per occurrence.

27.     The Liberty Mutual Policies have substantially similar terms and provide that Liberty Mutual shall "pay on behalf of the insured all sums which the **insured** shall become legally obligated to pay as damages because of . . . **property damage** to which this policy applies, caused by an **occurrence** and arising out of . . . all other operations of the **insured**."

28.     The Liberty Mutual Policies further provide that Liberty Mutual shall "have the right and duty to defend any suit against the **insured** seeking damages on account of . . . **property damage** . . . even if any of the allegations of the suit are groundless, false or fraudulent."

29.     The term "Property Damage" is defined under the Liberty Mutual Policies as:

(1) [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

30.     The term "Occurrence" is defined under the Liberty Mutual Policies as:

[I]njurious exposure, including a continuous or repeated exposure, to conditions, which results, during the policy period, in **personal injury** or **property damage** or **advertising offense** of loss under Coverage D or Coverage G neither expected or intended from the standpoint of the **insured**.

31.     In February 2012, Sapa tendered the claim stemming from the Underlying Action to Liberty Mutual.

32.     Sapa has complied with all terms of the Liberty Mutual Policies.

33.     To date, Liberty Mutual has issued a general reservation of rights, refused to provide defense or indemnity costs, and has filed a declaratory judgment action in this court, captioned as *Liberty Mutual Insurance Company v. Alcoa, Inc. and Sapa Extrusions, Inc.*, M.D. Pa., No. 3:13-cv-01405-MEM.

**National Union Alcoa Policies**

34.     National Union sold to Alcoa, Inc. a Commercial Umbrella Policy, Policy No. BE 357 74 78, for the policy period July 1, 1998 through July 1, 1999 (the "1998 National Union Alcoa Policy").  A copy of the 1998 National Union Policy is attached as Exhibit "D" and, by this reference, incorporated as though fully set forth herein.

35.     National Union sold to Alcoa, Inc. a Commercial Umbrella Policy, Policy No. BE 701 62 46, for the policy period July 1, 1999 through July 1, 2002 (the "1999 National Union Alcoa Policy").  A copy of the 1999 National Union Policy is attached as Exhibit "E" and, by this reference, incorporated as though fully set forth herein.

36.     National Union sold to Alcoa, Inc. a Commercial Umbrella Policy, Policy No. BE 2131282, for the policy period July 1, 2002 through July 1, 2003 (the "2002 National Union Alcoa Policy").  A copy of the 2002 National Union Policy is attached as Exhibit "F" and, by this reference, incorporated as though fully set forth herein.

37.     National Union sold to Alcoa, Inc. a Commercial Umbrella Policy, Policy No. BE 2860270, for the policy period July 1, 2003 through July 1, 2004 (the "2003 National Union Alcoa Policy").  A copy of the 2003 National Union Policy is attached as Exhibit "G" and, by this reference, incorporated as though fully set forth herein.  The 1998 National Union Alcoa Policy, the 1999 National Union Alcoa Policy, the 2002 National Union Alcoa Policy, and the 2003 National Union Alcoa Policy are hereafter collectively referenced as the "National Union Alcoa Policies".

38.     At the time of the National Union Alcoa Policies, Sapa, then known as Alcoa Extrusion, Inc., was a subsidiary company to Alcoa, Inc. and, therefore, a named insured under the Named Insured Endorsements of the National Union Alcoa Policies.

39.    The annual limits of liability under the 1998 National Union Alcoa Policy and the 1999 National Union Alcoa Policy are $40,000,000 (forty million dollars) per occurrence and under the 2002 National Union Alcoa Policy and the 2003 National Union Alcoa Policy are $50,000,000 (fifty million dollars).

40.    The National Union Alcoa Policies state: "If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance.  However, this provision will not apply if the other insurance is specifically written to be excess of this policy."

41.    The National Union Alcoa Policies provide that National Union:

> [W]ill pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of . . . **Property Damage** . . . that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world.

42.    The National Union Alcoa Policies further provide that National Union:

> [S]hall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:
>
> 1. The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by payment of claims to which this policy applies; or
>
> 2. Damages are sought for . . . **Property Damage** . . . covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

43.    The term "Property Damage" is defined under the National Union Alcoa Policies as:

> 1. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

8

2. Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the **Occurrence** that caused it.

44.     The term "Occurrence" is defined under the National Union Alcoa Policies as:

1. As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to conditions, which results in **Bodily Injury** or **Property Damage** neither expected nor intended from the standpoint of the **Insured**.  All such exposure to substantially the same general conditions shall be considered as arising out of one **Occurrence**.

45.     Sapa tendered the claim stemming from the Underlying Action to National Union.

46.     Sapa has complied with all terms of the National Union Alcoa Policies.

47.     To date, National Union has issued a general reservation of rights and refused to provide defense or indemnity costs.

## 1999 and 2002 GKA Policy

48.     GKA sold to Alcoa, Inc. an Excess Liability Insurance policy, Policy No. 509/DL286399, for the policy period of July 1, 1999 through July 1, 2002 (the "1999 GKA Policy").  A copy of the 1999 GKA Policy is attached as Exhibit "H" and, by this reference, incorporated as though fully set forth herein.

49.     GKA sold to Alcoa, Inc. an Excess Liability Insurance policy, Policy No. 509/DL376002, for the policy period of July 1, 2002 through July 1, 2003 (the "2002 GKA Policy").  A copy of the 2002 GKA Policy is attached as Exhibit "I" and, by this reference, incorporated as though fully set forth herein.

50.     The 1999 GKA Policy follows "all the terms and conditions of" the 1999 National Union Policy.

51.     The 2002 GKA Policy follows "all the terms and conditions of" the 2002 National Union Policy.

52.     The annual limits of liability under the 1999 GKA Policy and the 2002 GKA

Policy are $50,000,000 (fifty million dollars) per occurrence in excess of $50,000,000 (fifty

million dollars) of umbrella coverage, which is in excess of the primary policy.

53.     Sapa tendered the claim stemming from the Underlying Action to GKA.

54.     Sapa has complied with all terms of the 1999 GKA Policy and the 2002 GKA

Policy.

55.     To date, GKA has not issued a coverage decision and refused to provide defense

or indemnity costs.

## Pacific Policy

56.     Pacific sold to Alcoa, Inc. a General Liability Policy, Policy No. HDO

G20577071, for the policy period July 1, 2001 through July 1, 2002 (the "Pacific Policy").  A

copy of the Pacific Policy is attached as Exhibit "J" and, by this reference, incorporated as

though fully set forth herein.

57.     At the time of the Pacific Policy, Sapa, then known as Alcoa Extrusion, Inc., was

a subsidiary company to Alcoa, Inc. and, therefore, a named insured under the Schedule of

Named Insureds of the Pacific Policy.

58.     The limit of liability under the Pacific Policy is $5,000,000 (five million dollars)

per occurrence with a deductible of $1,000,000 (one million dollars) per occurrence.

59.     The Pacific Policy provides that Pacific:

> [W]ill pay those sums that the insured becomes legally obligated to pay as
> damages because of "bodily injury" or "property damage" to which this
> insurance applies.  We will have the right and duty to defend the insured
> against any "suit" seeking those damages.  However, we will have no duty
> to defend the insured against any "suit" seeking damages for "bodily
> injury" or "property damage" to which this insurance does not apply.

* * *

10

This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

60.     The term "Property Damage" is defined under the Pacific Policy as:

a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

61.     The term "Occurrence" is defined under the Pacific Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

62.     Sapa tendered the claim stemming from the Underlying Action to Pacific.

63.     Sapa has complied with all terms of the Pacific Policy.

64.     To date, Pacific has not provided a coverage decision and refused to provide defense or indemnity costs.

## ACE Primary Policies

65.     ACE sold to Alcoa, Inc. a General Liability Policy, Policy No. HDO G20586023, for the policy period July 1, 2002 through July 1, 2003 (the "2002 ACE Policy").

66.     ACE sold to Alcoa, Inc. a General Liability Policy, Policy No. HDO G21738335, for the policy period July 1, 2003 through July 1, 2004 (the "2003 ACE Policy").

67.     ACE sold to Alcoa, Inc. a General Liability Policy, Policy No. HDO G21707466, for the policy period July 1, 2004 through July 1, 2005 (the "2004 ACE Policy").

68.     ACE sold to Alcoa, Inc. a General Liability Policy, Policy No. HDO G2171804A, for the policy period July 1, 2005 through July 1, 2006 (the "2005 ACE Policy").  A copy of the

2005 ACE Policy is attached as Exhibit "K" and, by this reference, incorporated as though fully set forth herein.

69.     ACE sold to Alcoa, Inc. a General Liability Policy, Policy No. HDO G21734548, for the policy period July 1, 2006 through July 1, 2007 (the "2006 ACE Policy").  A copy of the 2006 ACE Policy is attached as Exhibit "L" and, by this reference, incorporated as though fully set forth herein.

70.     Upon information and belief, the 2002 ACE Policy, the 2003 ACE Policy, and the 2004 ACE Policy have substantially similar terms as the 2005 ACE Policy and the 2006 ACE Policy.  All of these policies are collectively referred to hereafter as the "ACE Primary Policies".

71.     At the time of the ACE Primary Policies, Sapa, then known as Alcoa Extrusion, Inc., was a subsidiary company to Alcoa, Inc. and, therefore, a named insured under the Schedule of Named Insureds in the ACE Policies.

72.     The annual limits of liability for the ACE Primary Policies are $5,000,000 (five million dollars) per occurrence with a $5,000,000 (five million dollars) deductible per occurrence.

73.     The ACE Primary Policies provide that ACE:

> [W]ill pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
>
> * * *
>
> This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

12

(2) The "bodily injury" or "property damage" occurs during the policy period.

74.    The term "Property Damage" is defined under the ACE Primary Policies as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

75.    The term "Occurrence" is defined under the ACE Primary Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

76.    Sapa tendered the claim stemming from the Underlying Action to ACE.

77.    Sapa has complied with all terms of the ACE Primary Policies.

78.    To date, ACE has refused to provide defense or indemnity costs.

**Arch Policies**

79.    Arch, at the time known as Rock River Insurance Company, sold to Alcoa, Inc. a Commercial Umbrella Policy, Policy No. 25RRULP0039100, for the policy period July 1, 2002 through May 15, 2003 (the "2002 Arch Policy"). A copy of the 2002 Arch Policy is attached as Exhibit "M" and, by this reference, incorporated as though fully set forth herein.

80.    The 2002 Arch Policy provides that:

a. This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, we will have no duty under Coverage **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

13

b. When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

81.     The limit of liability under the 2002 Arch Policy is $5,000,000 (five million dollars).

82.     The 2002 Arch Policy provides that Arch:

[W]ill pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted.  When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

\* \* \*

This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

83.     The term "Property Damage" is defined under the 2002 Arch Policy as:

a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured.  All such
   loss of use shall be deemed to occur at the time of the "occurrence" that
   caused it.

84.     The term "Occurrence" is defined under the 2002 Arch Policy as "an accident,

including continuous or repeated exposure to substantially the same general harmful conditions."

85.     Arch also sold to Alcoa, Inc. a Commercial Excess Third Party Liability Policy,

Policy No. 12UFP0039101, for the policy period July 1, 2003 through July 1, 2004 (the "2003

Arch Policy").  A copy of the 2003 Arch Policy is attached as Exhibit "N" and, by this reference,

incorporated as though fully set forth herein.  The 2002 Arch Policy and the 2003 Arch Policy

are hereafter collectively referred to as the "Arch Policies".

86.     The limit of liability under the 2003 Arch Policy is $25,000,000 (twenty five

million dollars) in excess of the $50,000,000 (fifty million dollars) of limits under the 2003

National Union Policy discussed below.

87.     The 2003 Arch Policy provides that Arch "will pay on behalf of the **insured** those

amounts of **loss** exceeding the limits of liability of all **underlying insurance** as stated in Item 3.

of the Declarations."

88.     The 2003 Arch Policy further provides that "the coverage follows the definitions,

terms, conditions, limitations, and exclusions of the **controlling underlying insurance** in effect

at the inception of this policy."

89.     The "controlling underlying insurance" is the 2003 National Union Policy.

90.     Sapa tendered the claim stemming from the Underlying Action to Arch.

91.     Sapa has complied with all terms of the 2002 Arch Policy and the 2003 Arch

Policy.

92.     To date, Arch has not provided a coverage decision and refused to provide

defense or indemnity costs.

**ACE Excess and Umbrella Policies**

93.     ACE sold to Alcoa, Inc. an Excess Liability Policy, Policy No. XCP G21742752, for the policy period July 1, 2003 through July 1, 2004 (the "2003 ACE Excess Policy").  A copy of the 2004 ACE Excess Policy is attached as Exhibit "O" and, by this reference, incorporated as though fully set forth herein.

94.     The 2003 ACE Excess Policy provides that ACE "will pay on YOUR behalf the ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE (whether such insurance is collectible or not)."

95.     The 2003 ACE Excess Policy provides: "The Definitions, Terms, Conditions, Limitations, and Exclusions of the UNDERLYING INSURANCE, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy."

96.     The Underlying Insurance is identified in the 2003 ACE Excess Policy as the 2003 National Union Policy and the 2003 Arch Policy.

97.     The limit of liability of the 2003 ACE Excess Policy is $25,000,000 (twenty five million dollars).

98.     ACE also sold to Alcoa, Inc. a Commercial Umbrella Liability Policy, Policy No. XOO G21976416, for the policy period July 1, 2004 through July 1, 2005 (the "2004 ACE Umbrella Policy").  A copy of the 2004 ACE Umbrella Policy is attached as Exhibit "P" and, by this reference, incorporated as though fully set forth herein.

99.     ACE also sold to Alcoa, Inc. a Commercial Umbrella Liability Policy, Policy No. XOO G22082723, for the policy period July 1, 2005 through July 1, 2006 (the "2005 ACE Umbrella Policy").  A copy of the 2005 ACE Umbrella Policy is attached as Exhibit "Q" and, by this reference, incorporated as though fully set forth herein.

100.     ACE also sold to Alcoa, Inc. a Commercial Umbrella Liability Policy, Policy No. XOO G23714632, for the policy period July 1, 2006 through July 1, 2007 (the "2006 ACE Umbrella Policy").  The 2004 ACE Umbrella Policy, the 2005 ACE Umbrella Policy, and the 2006 ACE Umbrella Policy are hereafter collectively referred to as the "ACE Umbrella Policies".

101.     At the time of the ACE Umbrella Policies, Sapa, then known as Alcoa Extrusion, Inc., was a subsidiary company to Alcoa, Inc. and, therefore, a person insured under the terms of the ACE Umbrella Policies.

102.     The annual limits of liability for the ACE Umbrella Policies are $25,000,000 (twenty five million dollars) per occurrence.

103.     The ACE Umbrella Policies provide that ACE:

> [W]ill pay on behalf of the INSURED all sums that the INSURED shall become legally obligated to pay as damages because of BODILY INJURY, PERSONAL AND ADVERTISING INJURY, or PROPERTY DAMAGE to which this policy applies that take place during the POLICY PERIOD.  The OCCURRENCE must take place in the COVERAGE TERRITORY.

104.     The ACE Umbrella Policies further provide that ACE:

> [S]hall be liable only for that portion of the ULTIMATE NET LOSS in excess of:
>
> 1. The applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not).

105.     The Schedules of Underlying Insurance under the ACE Umbrella Policies identify $5,000,000 (five million dollars) in coverage for Commercial General Liability as the Underlying Insurance.

106.     The term "Property Damage" is defined under the ACE Umbrella Policies as:

17

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the OCCURRENCE that caused it.

107.    The term "Occurrence" is defined under the ACE Umbrella Policies as "an accident including continuous or repeated exposure to substantially the same general harmful conditions."

108.    Sapa tendered the claim stemming from the Underlying Action to ACE.

109.    Sapa has complied with all terms of the 2004 ACE Excess Policy and the ACE Umbrella Policies.

110.    To date, ACE has refused to provide indemnity costs.

## **Great American Policies**

111.    Great American sold to Alcoa, Inc. a Commercial Excess Liability Policy, Policy No. EXC 5166048, for the policy period July 1, 2004 through July 1, 2005 (the "2004 Great American Policy"). A copy of the 2004 Great American Policy is attached as Exhibit "R" and, by this reference, incorporated as though fully set forth herein.

112.    Great American also sold to Alcoa, Inc. a Commercial Excess Liability Policy, Policy No. EXC 4718575, for the policy period July 1, 2005 through July 1, 2006 (the "2005 Great American Policy"). A copy of the 2005 Great American Policy is attached as Exhibit "S" and, by this reference, incorporated as though fully set forth herein.

113.    Great American sold to Alcoa, Inc. a Commercial Excess Liability Policy, Policy No. EXC 9251906, for the policy period July 1, 2006 through July 1, 2007 (the "2006 Great American Policy"). A copy of the 2006 Great American Policy is attached as Exhibit "T" and, by this reference, incorporated as though fully set forth herein. The 2004 Great American

Policy, the 2005 Great American Policy, and the 2006 Great American Policy are hereafter collectively referred to as the "Great American Policies".

114.    The annual limits of liability under the Great American Policies are $25,000,000 (twenty five million dollars) in excess of the Underlying Limits of insurance.

115.    The Great American Policies provide that:

> We will pay on behalf of the Insured the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance" shown in Item **5.** of the Declarations, subject to **INSURING AGREEMENT** Section **II., Limits of Insurance**.   Except for the terms, conditions, definitions, and exclusions of this policy, the coverage provided by this policy will follow the "first underlying insurance."

116.    The "first underlying insurance" is identified in the 2004 Great American Policy as the 2004 ACE Umbrella Policy.

117.    The "first underlying insurance" is identified in the 2005 Great American Policy as the 2005 ACE Umbrella Policy.

118.    The "first underlying insurance" is identified in the 2006 Great American Policy as the 2006 ACE Umbrella Policy.

119.    Sapa tendered the claim stemming from the Underlying Action to Great American.

120.    Sapa has complied with all terms of the Great American Policies.

121.    To date, Great American has stated that it has no current obligation to Sapa and refused to provide indemnity costs.

**American Guarantee Policy**

122.    American Guarantee sold to Alcoa, Inc. a Follow Form Excess Liability Policy, Policy No. AEC 5085881 00, for the policy period July 1, 2004 through July 1, 2005 (the

"American Guarantee Policy").  A copy of the American Guarantee Policy is attached as Exhibit

"U" and, by this reference, incorporated as though fully set forth herein.

123.    The Limit of Liability under the American Guarantee Policy is $50,000,000 (fifty

million dollars) in excess of $50,000,000 (fifty million dollars).

124.    The American Guarantee Policy provides:

A. We will pay on behalf of the insured the sums in excess of the total
Underlying Limits of Insurance shown in Item **6.B.** of the Declarations
that the insured becomes legally obligated to pay as damages.

B. This insurance applies only to damages covered by the Controlling
Underlying Policy as shown in Item **6.A.** of the Declarations.  Except as
otherwise provided by this policy, the coverage follows the definitions,
terms, conditions, limitations, and exclusions of the Controlling
Underlying Policy in effect at the inception of this policy.

125.    The Controlling Underlying Policy under the American Guarantee Policy is the

2004 ACE Umbrella Policy.

126.    Sapa tendered the claim stemming from the Underlying Action to American

Guarantee.

127.    Sapa has complied with all terms of the American Guarantee Policy.

128.    To date, American Guarantee has provided no coverage position and refused to

provide indemnity costs.

## 2005 and 2006 GKA Policies

129.    GKA sold to Alcoa, Inc. an Excess Liability Insurance policy, Policy No.

576/UK7365500, for the policy period of July 1, 2005 through July 1, 2006 (the "2005 GKA

Policy").  A copy of the 2005 GKA Policy is attached as Exhibit "V" and, by this reference,

incorporated as though fully set forth herein.

130.    GKA also sold to Alcoa, Inc. an Excess Liability Insurance policy, Policy No.

576/UL7365500, for the policy period of July 1, 2006 through July 1, 2007 (the "2006 GKA

Policy").  A copy of the 2006 GKA Policy is attached as Exhibit "W" and, by this reference, incorporated as though fully set forth herein.

131.    The 2005 GKA Policy follows "all the terms and conditions of" the 2005 ACE Umbrella Policy.

132.    The 2006 GKA Policy follows "all the terms and conditions of" the 2006 ACE Umbrella Policy.

133.    The annual limits of liability under the 2005 GKA Policy and the 2006 GKA Policy are $50,000,000 (fifty million dollars) per occurrence in excess of $25,000,000 (twenty five million dollars) of umbrella coverage, which is in excess of the primary policy.

134.    Sapa tendered the claim stemming from the Underlying Action to GKA.

135.    Sapa has complied with all terms of the 2005 GKA Policy and the 2006 GKA Policy.

136.    To date, GKA has not issued a coverage decision and refused to provide indemnity costs.

### ICSOP Policies

137.    ICSOP sold to Sapa Profiles, Inc., with Sapa Extrusions, Inc. as an insured, a Commercial General Liability Policy, Policy No. GL 721-90-79, for the policy period June 1, 2008 through June 1, 2009 (the "2008 ICSOP Primary Policy").  A copy of the 2008 ICSOP Primary Policy is attached as Exhibit "X" and, by this reference, incorporated as though fully set forth herein.

138.    ICSOP sold to Sapa North America, Inc., with Sapa Extrusions, Inc. as an insured, a General Liability Policy, Policy No. GL 091-26-40, for the policy period June 1, 2009 through June 1, 2010 (the "2009 ICSOP Primary Policy").  A copy of the 2009 ICSOP Primary

Policy is attached as Exhibit "Y" and, by this reference, incorporated as though fully set forth herein.  The 2009 ICSOP Primary Policy was cancelled on January 15, 2010.

139.    ICSOP sold to Sapa Extrusions, Inc. a General Liability Policy, Policy No. GL 226-45-02, for the policy period January 15, 2010 through June 1, 2011 (the "2010 ICSOP Primary Policy").  A copy of the 2010 ICSOP Primary Policy is attached as Exhibit "Z" and, by this reference, incorporated as though fully set forth herein.  The 2008 ICSOP Primary Policy, the 2009 ICSOP Primary Policy, and the 2010 ICSOP Primary Policy are hereafter collectively referred to as the "ICSOP Primary Policies".

140.    Under the Broad Form Named Insured endorsement in the 2008 ICSOP Primary Policy and the 2009 ICSOP Primary Policy, "Named Insured" is defined to include "any subsidiary, associated, affiliated, allied or acquired company or corporation", which includes Sapa.

141.    The limits of liability for the 2008 ICSOP Primary Policy and the 2009 ICSOP Primary Policy are $15,000,000 (fifteen million dollars) per occurrence with a $250,000 (two hundred fifty thousand dollars) deductible per occurrence.

142.    The limit of liability for the 2010 ICSOP Primary Policy is $1,000,000 (one million dollars) per occurrence with a $250,000 (two hundred fifty thousand dollars) deductible per occurrence.

143.    The ICSOP Primary Policies provide that ICSOP:

> [W]ill pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

* * *

This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period.

144.     The term "Property Damage" is defined under the ICSOP Primary Policies as:

a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

145.     The term "Occurrence" is defined under the ICSOP Primary Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

146.     Sapa tendered the claim stemming from the Underlying Action to ICSOP.

147.     Sapa has complied with all terms of the ICSOP Primary Policies.

148.     To date, ICSOP has provided no coverage decision and refused to provide defense or indemnity costs.

**National Union Sapa Policy**

149.     National Union sold to Sapa North America, with Sapa Extrusions, Inc. as an insured, a Commercial Umbrella Policy, Policy No. 27-471-704, for the policy period January 1, 2010 through June 1, 2010 (the "National Union Sapa Policy").  A copy of the National Union Sapa Policy is attached as Exhibit "AA" and, by this reference, incorporated as though fully set forth herein.

150.     The National Union Sapa Policy provides that Insured includes any insured under the Scheduled Underlying Insurance.

151.   The Underlying Scheduled Insurance under the National Sapa Policy is the 2010 ICSOP Primary Policy.

152.   The limit of liability under the National Union Sapa Policy is $14,000,000 (fourteen million dollars) per occurrence in excess of the Underlying Scheduled Insurance.

153.   The National Union Sapa Policy provides that National Union:

> [W]ill pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Property Damage** . . . to which this insurance applies or because of . . . **Property Damage** . . . to which this insurance applies assumed by the **Insured** under an **Insured Contract**.
>
> * * *
>
> This policy applies, only if:
>
> 1. The **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**.

154.   The National Union Sapa Policy further provides that National Union:

> [W]ill have the right and duty to defend any **Suit** against the **Insured** that seeks damages for . . . **Property Damage** . . . covered by this policy, even if the suit is groundless, false or fraudulent when:
>
> 1. the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by payment of **Loss** to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted; or
>
> 2. the damages sought because of . . . **Property Damage** . . . would not be covered by **Scheduled Underlying Insurance** or any applicable **Other Insurance**, even if the total applicable limits of either the **Scheduled Underlying Insurance** or any applicable **Other Insurance** had not been exhausted by the payment of the **Loss**.

155.   The term "Property Damage" is defined under the National Union Sapa Policy as:

> 1. [P]hysical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the **Occurrence** that caused it.

156.    The term "Occurrence" is defined under the National Union Sapa Policy as:

[A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**.

157.    Sapa tendered the claim stemming from the Underlying Action to National Union.

158.    Sapa has complied with all terms of the National Union Alcoa Policies.

159.    To date, National Union has issued a general reservation of rights, and refused to provide indemnity costs.

## FIRST COUNT
## BREACH OF CONTRACT VERSUS
## LIBERTY MUTUAL INSURANCE COMPANY

160.    Plaintiff incorporates by reference paragraphs 1 through 159, as though fully set forth herein.

161.    The 1998 Liberty Mutual Policy constitutes a valid and enforceable contract between the parties.

162.    Under the terms of the 1998 Liberty Mutual Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiff's claim for these losses.

163.    Liberty Mutual's conduct, in refusing to pay any of the litigation costs or settlement costs arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

164.    As a direct and proximate result of Liberty Mutual's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Liberty Mutual Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

## SECOND COUNT
## BREACH OF CONTRACT VERSUS
## LIBERTY MUTUAL INSURANCE COMPANY

165.     Plaintiff incorporates by reference paragraphs 1 through 164, as though fully set forth herein.

166.     The 2000 Liberty Mutual Policy constitutes a valid and enforceable contract between the parties.

167.     Under the terms of the 2000 Liberty Mutual Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiff's claim for these losses.

168.     Liberty Mutual's conduct, in refusing to pay any of the litigation costs or settlement costs arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

169.     As a direct and proximate result of Liberty Mutual's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Liberty Mutual Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

### THIRD COUNT
### BREACH OF CONTRACT VERSUS
### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

170.    Plaintiff incorporates by reference paragraphs 1 through 169, as though fully set forth herein.

171.    The 1998 National Union Alcoa Policy constitutes a valid and enforceable contract between the parties.

172.    Under the terms of the 1998 National Union Alcoa Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

173.    National Union's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

174.    As a direct and proximate result of National Union's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant National Union Fire Insurance Company of Pittsburgh, PA for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

### FOURTH COUNT
### BREACH OF CONTRACT VERSUS
### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

175.    Plaintiff incorporates by reference paragraphs 1 through 174, as though fully set forth herein.

176.    The 1999 National Union Alcoa Policy constitutes a valid and enforceable contract between the parties.

177.     Under the terms of the 1999 National Union Alcoa Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

178.     National Union's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

179.     As a direct and proximate result of National Union's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant National Union Fire Insurance Company of Pittsburgh, PA for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**FIFTH COUNT**
**BREACH OF CONTRACT VERSUS**
**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA**

180.     Plaintiff incorporates by reference paragraphs 1 through 179, as though fully set forth herein.

181.     The 2002 National Union Alcoa Policy constitutes a valid and enforceable contract between the parties.

182.     Under the terms of the 2002 National Union Alcoa Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

183.     National Union's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

184.    As a direct and proximate result of National Union's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant National Union Fire Insurance Company of Pittsburgh, PA for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

### SIXTH COUNT
### BREACH OF CONTRACT VERSUS
### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

185.    Plaintiff incorporates by reference paragraphs 1 through 184, as though fully set forth herein.

186.    The 2003 National Union Alcoa Policy constitutes a valid and enforceable contract between the parties.

187.    Under the terms of the 2003 National Union Alcoa Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

188.    National Union's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

189.    As a direct and proximate result of National Union's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant National Union Fire Insurance Company of Pittsburgh, PA for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**SEVENTH COUNT**
**BREACH OF CONTRACT VERSUS**
**GERLING KONZERN ALLEGEMEINE VERSICHERUNGS-AG A/K/A GERLING KONZERN GENERAL INSURANCE COMPANY**

190.    Plaintiff incorporates by reference paragraphs 1 through 189, as though fully set forth herein.

191.    The 1999 GKA Policy constitutes a valid and enforceable contract between the parties.

192.    Under the terms of the 1999 GKA Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

193.    GKA's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

194.    As a direct and proximate result of GKA's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gerling Konzern Allegemeine Versicherungs-AG a/k/a Gerling Konzern General Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**EIGHTH COUNT**
**BREACH OF CONTRACT VERSUS**
**GERLING KONZERN ALLEGEMEINE VERSICHERUNGS-AG A/K/A GERLING**
**KONZERN GENERAL INSURANCE COMPANY**

195.    Plaintiff incorporates by reference paragraphs 1 through 194, as though fully set forth herein.

196.    The 2002 GKA Policy constitutes a valid and enforceable contract between the parties.

197.    Under the terms of the 2002 GKA Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

198.    GKA's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

199.    As a direct and proximate result of GKA's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gerling Konzern Allegemeine Versicherungs-AG a/k/a Gerling Konzern General Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**NINTH COUNT**
**BREACH OF CONTRACT VERSUS**
**PACIFIC EMPLOYERS INSURANCE COMPANY**

200.    Plaintiff incorporates by reference paragraphs 1 through 199, as though fully set forth herein.

201.    The Pacific Policy constitutes a valid and enforceable contract between the parties.

202.    Under the terms of the Pacific Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

203.    Pacific's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

204.    As a direct and proximate result of Pacific's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Pacific Employers Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TENTH COUNT**
**BREACH OF CONTRACT VERSUS**
**ACE AMERICAN INSURANCE COMPANY**

205.    Plaintiff incorporates by reference paragraphs 1 through 204, as though fully set forth herein.

206.    The 2002 ACE Policy constitutes a valid and enforceable contract between the parties.

207.    Under the terms of the 2002 ACE Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

208.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

209.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**ELEVENTH COUNT**
**BREACH OF CONTRACT VERSUS**
**ACE AMERICAN INSURANCE COMPANY**

210.     Plaintiff incorporates by reference paragraphs 1 through 209, as though fully set forth herein.

211.     The 2003 ACE Policy constitutes a valid and enforceable contract between the parties.

212.     Under the terms of the 2003 ACE Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

213.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

214.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's

fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWELFTH COUNT**
**BREACH OF CONTRACT VERSUS**
**ACE AMERICAN INSURANCE COMPANY**

215.     Plaintiff incorporates by reference paragraphs 1 through 214, as though fully set forth herein.

216.     The 2004 ACE Policy constitutes a valid and enforceable contract between the parties.

217.     Under the terms of the 2004 ACE Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

218.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

219.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

## THIRTEENTH COUNT
### BREACH OF CONTRACT VERSUS
### ACE AMERICAN INSURANCE COMPANY

220.     Plaintiff incorporates by reference paragraphs 1 through 219, as though fully set forth herein.

221.     The 2005 ACE Policy constitutes a valid and enforceable contract between the parties.

222.     Under the terms of the 2005 ACE Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

223.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

224.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

## FOURTEENTH COUNT
### BREACH OF CONTRACT VERSUS
### ACE AMERICAN INSURANCE COMPANY

225.     Plaintiff incorporates by reference paragraphs 1 through 224, as though fully set forth herein.

226.     The 2006 ACE Policy constitutes a valid and enforceable contract between the parties.

227.     Under the terms of the 2006 ACE Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

228.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

229.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**FIFTEENTH COUNT**
**BREACH OF CONTRACT VERSUS**
**ARCH SPECIALTY INSURANCE COMPANY f/k/a ROCK RIVER INSURANCE COMPANY**

230.     Plaintiff incorporates by reference paragraphs 1 through 229, as though fully set forth herein.

231.     The 2002 Arch Policy constitutes a valid and enforceable contract between the parties.

232.     Under the terms of the 2002 Arch Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

233.     Arch's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

234.    As a direct and proximate result of Arch's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Arch Specialty Insurance Company f/k/a Rock River Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

<u>SIXTEENTH COUNT</u>
**BREACH OF CONTRACT VERSUS**
**ARCH SPECIALTY INSURANCE COMPANY f/k/a ROCK RIVER INSURANCE**
**COMPANY**

235.    Plaintiff incorporates by reference paragraphs 1 through 234, as though fully set forth herein.

236.    The 2003 Arch Policy constitutes a valid and enforceable contract between the parties.

237.    Under the terms of the 2003 Arch Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

238.    Arch's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

239.    As a direct and proximate result of Arch's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

37

**WHEREFORE**, Plaintiff demands judgment against Defendant Arch Specialty

Insurance Company f/k/a Rock River Insurance Company for compensatory damages,

prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems

equitable and just.

**SEVENTEENTH COUNT**
**BREACH OF CONTRACT VERSUS**
**ACE AMERICAN INSURANCE COMPANY**

240.    Plaintiff incorporates by reference paragraphs 1 through 239, as though fully set

forth herein.

241.    The 2003 ACE Excess Policy constitutes a valid and enforceable contract

between the parties.

242.    Under the terms of the 2003 ACE Excess Policy, there are no exclusions or

limitations that would preclude coverage of the Plaintiffs' claim for these losses.

243.    ACE's conduct, in refusing to pay any of the litigation costs or settlement cost

arising from the Underlying Action, constitutes a breach of contract for which no justification

exists.

244.    As a direct and proximate result of ACE's breach of its contract of insurance with

Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of

settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American

Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs

of suit, and such other relief as the Court deems equitable and just.

## EIGHTEENTH COUNT
## BREACH OF CONTRACT VERSUS
## ACE AMERICAN INSURANCE COMPANY

245.     Plaintiff incorporates by reference paragraphs 1 through 244, as though fully set forth herein.

246.     The 2004 ACE Umbrella Policy constitutes a valid and enforceable contract between the parties.

247.     Under the terms of the 2004 ACE Umbrella Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

248.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

249.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

## NINETEENTH COUNT
## BREACH OF CONTRACT VERSUS
## ACE AMERICAN INSURANCE COMPANY

250.     Plaintiff incorporates by reference paragraphs 1 through 249, as though fully set forth herein.

251.     The 2005 ACE Umbrella Policy constitutes a valid and enforceable contract between the parties.

252.     Under the terms of the 2005 ACE Umbrella Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

253.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

254.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTIETH COUNT**
**BREACH OF CONTRACT VERSUS**
**ACE AMERICAN INSURANCE COMPANY**

255.     Plaintiff incorporates by reference paragraphs 1 through 254, as though fully set forth herein.

256.     The 2006 ACE Umbrella Policy constitutes a valid and enforceable contract between the parties.

257.     Under the terms of the 2006 ACE Umbrella Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

258.     ACE's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

259.     As a direct and proximate result of ACE's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant ACE American Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-FIRST COUNT**
**BREACH OF CONTRACT VERSUS**
**GREAT AMERICAN ASSURANCE COMPANY**

260.     Plaintiff incorporates by reference paragraphs 1 through 259, as though fully set forth herein.

261.     The 2004 Great American Policy constitutes a valid and enforceable contract between the parties.

262.     Under the terms of the 2004 Great American Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

263.     Great American's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

264.     As a direct and proximate result of Great American's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Great American Assurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-SECOND COUNT**
**BREACH OF CONTRACT VERSUS**
**GREAT AMERICAN ASSURANCE COMPANY**

265.     Plaintiff incorporates by reference paragraphs 1 through 264, as though fully set forth herein.

266.     The 2005 Great American Policy constitutes a valid and enforceable contract between the parties.

267.     Under the terms of the 2005 Great American Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

268.     Great American's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

269.     As a direct and proximate result of Great American's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Great American Assurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-THIRD COUNT**
**BREACH OF CONTRACT VERSUS**
**GREAT AMERICAN ASSURANCE COMPANY**

270.     Plaintiff incorporates by reference paragraphs 1 through 269, as though fully set forth herein.

271.     The 2006 Great American Policy constitutes a valid and enforceable contract between the parties.

272.     Under the terms of the 2006 Great American Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

273.     Great American's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

274.     As a direct and proximate result of Great American's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Great American Assurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-FOURTH COUNT**
**BREACH OF CONTRACT VERSUS**
**AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY**

275.     Plaintiff incorporates by reference paragraphs 1 through 274, as though fully set forth herein.

276.     The American Guarantee Policy constitutes a valid and enforceable contract between the parties.

277.     Under the terms of the American Guarantee Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

278.     American Guarantee's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

279.     As a direct and proximate result of American Guarantee's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant American Guarantee & Liability Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

### TWENTY-FIFTH COUNT
### BREACH OF CONTRACT VERSUS
### GERLING KONZERN ALLEGEMEINE VERSICHERUNGS-AG A/K/A GERLING KONZERN GENERAL INSURANCE COMPANY

280.     Plaintiff incorporates by reference paragraphs 1 through 279, as though fully set forth herein.

281.     The 2005 GKA Policy constitutes a valid and enforceable contract between the parties.

282.     Under the terms of the 2005 GKA Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

283.     GKA's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

284.     As a direct and proximate result of GKA's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gerling Konzern Allegemeine Versicherungs-AG a/k/a Gerling Konzern General Insurance Company for

compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

## TWENTY-SIXTH COUNT
### BREACH OF CONTRACT VERSUS
### GERLING KONZERN ALLEGEMEINE VERSICHERUNGS-AG A/K/A GERLING KONZERN GENERAL INSURANCE COMPANY

285.    Plaintiff incorporates by reference paragraphs 1 through 284, as though fully set forth herein.

286.    The 2006 GKA Policy constitutes a valid and enforceable contract between the parties.

287.    Under the terms of the 2006 GKA Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

288.    GKA's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

289.    As a direct and proximate result of GKA's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Gerling Konzern Allegemeine Versicherungs-AG a/k/a Gerling Konzern General Insurance Company for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-SEVENTH COUNT**
**BREACH OF CONTRACT VERSUS**
**INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA**

290.    Plaintiff incorporates by reference paragraphs 1 through 289, as though fully set forth herein.

291.    The 2008 ICSOP Primary Policy constitutes a valid and enforceable contract between the parties.

292.    Under the terms of the 2008 ICSOP Primary Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

293.    ICSOP's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

294.    As a direct and proximate result of ICSOP's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Insurance Company of the State of Pennsylvania for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-EIGHTH COUNT**
**BREACH OF CONTRACT VERSUS**
**INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA**

295.    Plaintiff incorporates by reference paragraphs 1 through 294, as though fully set forth herein.

296.    The 2009 ICSOP Primary Policy constitutes a valid and enforceable contract between the parties.

297.     Under the terms of the 2009 ICSOP Primary Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

298.     ICSOP's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

299.     As a direct and proximate result of ICSOP's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Insurance Company of the State of Pennsylvania for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

**TWENTY-NINTH COUNT**
**BREACH OF CONTRACT VERSUS**
**INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA**

300.     Plaintiff incorporates by reference paragraphs 1 through 299, as though fully set forth herein.

301.     The 2010 ICSOP Primary Policy constitutes a valid and enforceable contract between the parties.

302.     Under the terms of the 2010 ICSOP Primary Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

303.     ICSOP's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

304.     As a direct and proximate result of ICSOP's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

**WHEREFORE**, Plaintiff demands judgment against Defendant Insurance Company of the State of Pennsylvania for compensatory damages, prejudgment and post-judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

### THIRTIETH COUNT
### BREACH OF CONTRACT VERSUS
### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

305.     Plaintiff incorporates by reference paragraphs 1 through 300, as though fully set forth herein.

306.     The National Union Sapa Policy constitutes a valid and enforceable contract between the parties.

307.     Under the terms of the National Union Sapa Policy, there are no exclusions or limitations that would preclude coverage of the Plaintiffs' claim for these losses.

308.     National Union's conduct, in refusing to pay any of the litigation costs or settlement cost arising from the Underlying Action, constitutes a breach of contract for which no justification exists.

309.     As a direct and proximate result of National Union's breach of its contract of insurance with Plaintiff, Plaintiff has sustained considerable damage including, but not limited to, attorney's fees and costs of suit and costs of settlement in the Underlying Action, all of which are compensable.

WHEREFORE, Plaintiff demands judgment against Defendant National Union Fire

Insurance Company of Pittsburgh, PA for compensatory damages, prejudgment and post-

judgment interest, costs of suit, and such other relief as the Court deems equitable and just.

Respectfully submitted,

OFFIT KURMAN

/s/ William H. Pillsbury
WILLIAM H. PILLSBURY, ESQ.
*Attorneys for Plaintiff Sapa Extrusions, Inc.*

Dated: November 19, 2013

4810-4915-5094, v.  1