# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SAPA EXTRUSIONS, INC.** | : | |
| | : | **CIVIL ACTION NO. 3:13-2827** |
| **Plaintiff** | : | |
| | : | **(JUDGE MANNION)** |
| **v.** | : | |
| | : | |
| **LIBERTY MUTUAL INSURANCE** | : | |
| **COMPANY**, *et al.* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court are seven cross-motions for summary judgment. These pending motions include (1) a motion for partial summary judgment, (Doc. 181), filed by plaintiff Sapa Extrusions, Inc. ("Sapa");[1] (2) a motion for summary judgment, (Doc. 150), filed by defendant Gerling-Konzern Allgemeine Versicherungs-AG ("Gerling"); (3) a motion for summary judgment, (Doc. 178), filed by defendant Liberty Mutual Insurance Company ("Liberty"); (4) a motion for summary judgment, (Doc. 185), filed by defendant Great American Assurance Company ("Great American"); (5) a motion for summary judgment, (Doc. 187), filed by defendant Arch Specialty Insurance Company ("Arch"); (6) a motion for summary judgment, (Doc. 191), filed jointly by

---

[1] The term "Sapa" is used to refer to Sapa Extrusions, Inc. as well as Alcoa Extrusions, Inc. and Alumax, Inc., its predecessors-in-interest.

defendants National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and Insurance Company of the State of Pennsylvania ("ICSOP"); and (7) a motion for summary judgment, (Doc. 197), filed jointly by defendants Pacific Employers Insurance Company ("Pacific") and ACE American Insurance Company ("ACE American"). The arguments advanced in favor of summary judgment by these nine defendants (collectively, the "Defendant Insurers") often overlap and at times are virtually indistinguishable, so the court will consider those arguments in this single memorandum and corresponding order. Based upon the court's review of these pending motions and their related materials, Sapa's motion will be **DENIED**, and the Defendant Insurers' motions will be **GRANTED**.

## I.    BACKGROUND

The following are the undisputed facts material to resolving the pending motions for summary judgment.[2] Sapa manufactures and sells aluminum

---

[2] The relevant facts are taken from the pleadings, (Doc. 60; Doc. 72; Doc. 73; Doc. 74; Doc. 77; Doc. 78; Doc. 79; Doc. 80; Doc. 81; Doc. 82), Sapa's statements of material facts, (Doc. 156; Doc. 159; Doc. 183; Doc. 246; Doc. 248; Doc. 250; Doc. 252; Doc. 253; Doc. 297: Doc. 298), the Defendant Insurers' statements of material facts, (Doc. 152; Doc. 169; Doc. 190; Doc.

(*footnote is continued on the next page*)

window extrusions, which are custom-cut metal window fittings made from aluminum alloys and coated with primer and topcoat. (Doc. 182). Marvin Lumber & Cedar Company and Marvin Windows of Tennessee, Inc. (collectively, "Marvin") were longtime purchasers of Sapa's extrusions. (*Id.*). Marvin incorporated Sapa's extrusions into the aluminum-clad windows and doors that it manufactures. (*Id.*). Between 2000 and 2010, Sapa sold Marvin approximately 28 million extrusions, which constituted roughly 87% of all extrusions purchased by Marvin during that time period. (Doc. 183). From these aluminum extrusions, Marvin produced approximately 8.5 million aluminum-clad windows and doors. (Doc. 200).

Over time, the paint on the aluminum-clad portions of many of Marvin's windows and doors began "oxidizing" (bubbling and cracking), which caused Marvin to undertake extensive (and expensive) repairs. (Doc. 183). In an attempt to address the concerns of Marvin's customers, Marvin initially hired a third party to refinish the specific areas damaged by oxidation. (*Id.*). Eventually, however, Marvin transitioned toward replacing the affected portions of its aluminum-clad windows and doors altogether due to the

_____

193; Doc. 199; Doc. 214; Doc. 240; Doc. 242; Doc. 255; Doc. 257; Doc. 265; Doc. 266; Doc. 343), and all parties' corresponding evidentiary exhibits. Any facts that remain in dispute are noted as such.

continued recurrence of oxidation issues. (*Id.*). As a result, Marvin ultimately sued Sapa in *Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc.*, 964 F. Supp. 2d 993, 997 (D. Minn. 2013) (the "Underlying Action"), to recoup its repair costs for approximately 25,000 aluminum-clad units. (Doc. 183).

On September 9, 2010, Marvin filed its complaint in the Underlying Action, asserting claims for breach of contract, breach of express warranty, breach of implied warranty, fraud, fraudulent concealment, negligent misrepresentation, and unlawful trade practices. (Doc. 1, Exh. A). Primarily, Marvin alleged that while Sapa entered into an agreement on August 1, 1996 to supply Marvin with extrusions that met or exceeded the specifications set forth by the American Architectural Manufacturers Association ("AAMA"), Sapa nevertheless altered its manufacturing techniques for its extrusions in 2003 without informing Marvin and continued to represent to Marvin that it was still utilizing the previously agreed-to techniques. (*Id.*). Specifically, Marvin claimed that "[s]ome of the . . . extru[sions] . . . purchased by Marvin from Sapa did not perform as intended, represented, and agreed" when they "prematurely failed in coastal locations in the field at an abnormal rate" by "peeling, losing adhesion, or otherwise degrading." (*Id.*). Marvin alleged that, upon further inspection, Sapa's products did not consistently meet the AAMA's requirements, even though Sapa had agreed by contract to ensure that those

requirements were satisfied. (*Id.*). When even more aluminum-clad windows and doors made with Sapa's extrusions began to fail, Marvin secured an alternative supplier. (*Id.*).

As damages in the Underlying Action, Marvin claimed that it had suffered economic losses stemming from "investigating and responding to" consumer complaints, "identifying and qualifying alternative" extrusion suppliers, "repairing" and "replacing" the failed extrusions, rebuilding its "valuable reputation," and experiencing lost "sales and profits." (*Id.*). The Defendant Insurers characterize the damages demanded in Underlying Action as limited to the cost of replacing the extrusions themselves, but Sapa contends that Marvin also sought compensation for the cost of repairing damage to additional areas of customers' homes that surrounded the aluminum-clad windows and doors incorporating Sapa's products. (Doc. 335; Doc. 343). Sapa's expert witness testified that some surrounding property inside customers' homes was indirectly damaged through the subsequent process of installing new extrusions to replace the failed ones. (Doc. 253; Doc. 335; Doc. 343). According to this testimony, these so-called "interior refinish" repairs were undertaken because many of the homes in which the extrusions failed had "intricate plaster work and woodwork around the windows" that needed to be fixed and refinished after the failed extrusions were ripped out

- 5 -

and replaced with new ones. (Doc. 214). The evidence of record, however, does not support the conclusion that the failure of Sapa's extrusions directly caused damage to external property by, for instance, allowing rainwater to invade customers' homes. (Doc. 214; Doc. 253). Sapa ultimately concedes that Marvin's complaint in the Underlying Action never set forth a specific category of damages called "interior refinish." (Doc. 253; Doc. 343).

The parties to this case dispute portions of the relevant timeline, including the specific date on which Marvin began receiving complaints related to oxidation issues from its customers and the specific date on which Sapa eventually learned of these issues. The Defendant Insurers maintain that the complaints began (and that Sapa knew of these issues) as early as 1996 and 1997, when Marvin met with representatives from Sapa to discuss problems related to paint corrosion. (Doc. 214; Doc. 253). In the Underlying Action, however, Marvin specifically distinguished the problems addressed during those discussions from the problems supplying the basis for its claims against Sapa. (Doc. 214; Doc. 253). Specifically, Marvin argued that the "corrosion" problems observed in 1996 were excluded from the "oxidation" problems observed after Sapa had allegedly breached its contract by altering its pretreatment process. (Doc. 253).

According to expert testimony from the Underlying Action, customers did not begin complaining of oxidation issues until 2000. (Doc. 183; Doc. 222). Testimony from a Sapa sales representative in the Underlying Action notes that "Marvin advised Sapa . . . of paint failure" problems in April 2000, indicating that Sapa was at least made aware of problems similar to those at issue in the Underlying Action by this date. (Doc. 335; Doc. 343). Sapa maintains, however, that it did not learn of the specific "oxidation" problems at issue in the Underlying Action until May 2007. (Doc. 253). It remains largely unclear when Marvin began receiving consumer complaints about the "oxidation" problems at issue in the Underlying Action, as opposed to complaints about other types of corrosion and deterioration. Disputes of fact also remain regarding the precise date when Sapa caught wind of the fact that oxidation issues had arisen.

On August 2, 2013, the United States District Court for the District of Minnesota in the Underlying Action held that (1) issues of material fact precluded summary judgment on the question of whether Sapa provided Marvin with an express warranty, noting further that any warranty found to exist by a jury would be enforceable; (2) issues of material fact precluded summary judgment on the question of whether Sapa breached its contract with Marvin because it was factually unclear whether Marvin's revocation of its

acceptance of Sapa's nonconforming goods occurred within a reasonable amount of time; (3) issues of material fact precluded summary judgment on the question of whether the parties had an indemnity agreement for Sapa to reimburse Marvin for any expenses incurred due to malfunctions in products that incorporated Sapa's extrusions; (4) Marvin's decision to provide Sapa with manufacturing specifications (the AAMA standards) precluded it from asserting breach of implied warranty claims; and (5) Sapa owed Marvin no independent, extra-contractual duty of care to sustain Marvin's tort-based claims for fraud, fraudulent concealment, negligent misrepresentation, and unlawful trade practices. *See Marvin Lumber & Cedar Co.*, 964 F. Supp. 2d at 1010. "Under Minnesota law," the District of Minnesota held, "a breach of contract, even if done in bad faith, is not a tort." *Id.* at 1006. Since Sapa had contracted to comply with agreed-upon manufacturing standards, its duty to Marvin for failing to comply with those standards was contractual in nature. *See id.* Following this decision, the parties to the Underlying Action, Marvin and Sapa, entered into a confidential settlement agreement.

Between 1998 and 2011, Sapa purchased a total of twenty-seven separate insurance policies from the Defendant Insurers (collectively, the "Policies at Issue") with varying degrees of general, umbrella, and excess commercial liability coverage. (Doc. 60). On November 19, 2013, Sapa

initiated the above-captioned lawsuit, claiming that the Defendant Insurers breached their respective insurance contracts by "refusing" to reimburse Sapa for its costs expended litigating and ultimately settling the Underlying Action. (Doc. 1). Sapa's amended complaint asserts twenty-seven separate counts for breach of contract—one for each of the Policies at Issue—against the Defendant Insurers. (Doc. 60). In count twenty-eight, Sapa further requests a declaratory judgment setting forth the Defendant Insurers' respective coverage obligations under the Policies at Issue. (*Id.*). The Defendant Insurers have each denied coverage obligations under the Policies at Issue. (*Id.*).

The Policies at Issue include the following: (1) a commercial general liability policy issued by Liberty in 1998 as "Policy No. RG1-681-004072-017" (the "1998 Liberty Policy") that provides coverage from April 1, 1998 through July 1, 2000, (Doc. 1, Exh. C); (2) a commercial umbrella policy issued by National in 1998 as "Policy No. BE 3577478" (the "1998 National Umbrella Policy") that provides coverage from July 1, 1998 through July 1, 1999 (Doc. 1, Exh. D); (3) a commercial umbrella policy issued by National in 1999 as "Policy No. BE 7016246" (the "1999 National Umbrella Policy") that provides coverage from July 1, 1999 through July 1, 2002, (Doc. 1, Exh. E); (4) a commercial umbrella policy issued by National in 2002 as "Policy No. BE 2131282" (the "2002 National Umbrella Policy") that provides coverage from

July 1, 2002 through July 1, 2003, (Doc. 1, Exh. F); (5) a commercial umbrella policy issued by National in 2003 as "Policy No. BE 2860270" (the "2003 National Umbrella Policy") that provides coverage from July 1, 2003 through July 1, 2004, (Doc. 1, Exh. G); (6) an excess liability policy issued by Gerling in 1999 as "Policy No. 509/DL286399" (the "1999 Gerling Excess Policy") that provides coverage from July 1, 1999 through July 1, 2002, (Doc. 1, Exh. H); (7) an excess liability policy issued by Gerling in 2002 as "Policy No. 509/DL376002" (the "2002 Gerling Excess Policy") that provides coverage from July 1, 2002 through July 1, 2003, (Doc. 1, Exh. I); (8) a commercial general liability policy issued by Pacific in 2001 as "Policy No. HDO G20577071" (the "2001 Pacific Policy") that provides coverage from July 1, 2001 through July 1, 2002, (Doc. 1, Exh. J); (9) a commercial general liability policy issued by ACE in 2002 as "Policy No. HDO G20586023" (the "2002 ACE Policy") that provides coverage from July 1, 2002 through July 1, 2003, (Doc. 60); (10) a commercial general liability policy issued by ACE in 2003 as "Policy No. HDO G21738335" (the "2003 ACE Policy") that provides coverage from July 1, 2003 through July 1, 2004, (Doc. 60); (11) a commercial general liability policy issued by ACE in 2004 as "Policy No. HDO G21707466" (the "2004 ACE Policy") that provides coverage from July 1, 2004 through July 1, 2005, (Doc. 60); (12) a commercial general liability policy issued by ACE in

2005 as "Policy No. HDO G2171804A" (the "2005 ACE Policy") that provides coverage from July 1, 2005 through July 1, 2006, (Doc. 1, Exh. K); (13) a commercial general liability policy issued by ACE in 2006 as "Policy No. HDO G21734548" (the "2006 ACE Policy") that provides coverage from July 1, 2006 through July 1, 2007, (Doc. 1, Exh. L); (14) a commercial umbrella policy issued by Arch in 2002 as "Policy No. 25RRULP0039100" (the "2002 Arch Umbrella Policy") that provides coverage from July 1, 2002 through May 15, 2003, (Doc. 1, Exh. M); (15) an excess liability policy issued by Arch in 2003 as "Policy No. 12UFP0039101" (the "2003 Arch Excess Policy") that provides coverage from July 1, 2003 through July 1, 2004, (Doc. 1, Exh. N); (16) a commercial umbrella policy issued by ACE in 2004 as "Policy No. XOO G21976416" (the "2004 ACE Umbrella Policy") that provides coverage from July 1, 2004 through July 1, 2005, (Doc. 1, Exh. P); (17) a commercial umbrella policy issued by ACE in 2005 as "Policy No. XOO G22082723" (the "2005 ACE Umbrella Policy") that provides coverage from July 1, 2005 through July 1, 2006, (Doc. 1, Exh. Q); (18) a commercial umbrella policy issued by ACE in 2006 as "Policy No. XOO G23714632" (the "2006 ACE Umbrella Policy") that provides coverage from July 1, 2006 through July 1, 2007, (Doc. 60); (19) an excess liability policy issued by Great American in 2004 as "Policy No. EXC 5166048" (the "2004 Great American Excess

Policy") that provides coverage from July 1, 2004 through July 1, 2005, (Doc. 1, Exh. R); (20) an excess liability policy issued by Great American in 2005 as "Policy No. EXC 4718575" (the "2005 Great American Excess Policy") that provides coverage from July 1, 2005 through July 1, 2006, (Doc. 1, Exh. S); (21) an excess liability policy issued by Great American in 2006 as "Policy No. EXC 9251906" (the "2006 Great American Excess Policy") that provides coverage from July 1, 2006 through July 1, 2007, (Doc. 1, Exh. T); (22) an excess liability policy issued by Gerling in 2005 as "Policy No. 576/UK7365500" (the "2005 Gerling Excess Policy") that provides coverage from July 1, 2005 through July 1, 2006, (Doc. 1, Exh. V); (23) an excess liability policy issued by Gerling in 2006 as "Policy No. 576/UL7365500" (the "2006 Gerling Excess Policy") that provides coverage from July 1, 2006 through July 1, 2007, (Doc. 1, Exh. W); (24) a commercial general liability policy issued by ICSOP in 2008 as "Policy No. GL 721-90-79" (the "2008 ICSOP Policy") that provides coverage from June 1, 2008 through June 1, 2009, (Doc. 1, Exh. X); (25) a commercial general liability policy issued by ICSOP in 2009 as "Policy No. GL 091-26-40" (the "2009 ICSOP Policy") that provides coverage from June 1, 2009 through June 1, 2010, (Doc. 1, Exh. Y); (26) a commercial general liability policy issued by ICSOP in 2010 as "Policy No. GL 226-45-02" (the "2010 ICSOP Policy") that provides coverage from

January 1, 2010 through June 1, 2011, (Doc. 1, Exh. Z); and (27) a commercial umbrella policy issued by National in 2010 as "Policy No. 27-471-704" (the "2010 National Umbrella Policy") that provides coverage from January 1, 2010 through June 1, 2010, (Doc. 1, Exh. AA).

The Policies at Issue are "occurrence-based" and thus only provide coverage in the event of an "occurrence," which is a contractual term. (Doc. 60). The parties fundamentally dispute whether the events at issue in the Underlying Action amount to a covered "occurrence." (Doc. 151; Doc. 157; Doc. 182; Doc. 192; Doc. 239; Doc. 244; Doc. 245; Doc. 247; Doc. 249; Doc. 251; Doc. 256; Doc. 259; Doc. 260; Doc. 306; Doc. 307).

Sapa further argues that additional provisions of the Policies at Issue, such as the "Products-Completed Operations Hazard" provisions and the "Insured Contract" provisions, compel a finding that coverage is due. (Doc. 296). The Defendant Insurers deny this assertion. (Doc. 260). Many of the Policies at Issue also contain certain express exclusions from coverage built directly into the policy language, including the so-called "Your Product" exclusions, "Impaired Property" exclusions, "Sistership" exclusions, and "Known Loss" exclusions. (Doc. 211; Doc. 245). The Defendant Insurers assert that even if Sapa has satisfied the "occurrence" requirement such that it triggers coverage, coverage is nonetheless precluded due to the applicability

of these express exclusions. (Doc. 151; Doc. 192; Doc. 211; Doc. 306). Finally, the parties dispute the applicability of particular "trigger theories" of insurance coverage, which—in the event of a covered "occurrence"—would determine which of the Policies at Issue were triggered. (Doc. 259; Doc. 306).

These issues before the court have been fully briefed and are now ripe for summary judgment.

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party, and it is "material" if proof of its existence or nonexistence would affect the outcome of the trial under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-57 (1986); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

To determine whether a genuine dispute of material fact exists, the court should consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In doing so, the court must view all the evidence and any inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)). However, the court's function at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. *See also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (noting that the court may neither weigh the evidence nor make credibility determinations).

Parties seeking to establish that a fact is or is not genuinely disputed may not rely on unsubstantiated allegations. Rather, they must support such assertions by "citing to particular parts of materials in the record" to demonstrate that the adverse party's factual assertion either lacks support from cited materials or is unsupported by admissible evidence. Fed. R. Civ. P. 56(c)(1). *See also Celotex Corp.*, 477 U.S. at 324 (requiring evidentiary

support for factual assertions made during summary judgment). A party's failure to properly support or contest an assertion of fact may result in that fact being considered undisputed for purposes of the summary judgment motion, although the court may also grant parties an opportunity to properly provide support for an asserted fact. Fed. R. Civ. P. 56(e).

To prevail on a motion for summary judgment, the moving party must affirmatively identify those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323-24. The moving party can satisfy this burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). *See also id.* at 325.

If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts" to avoid summary judgment. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)). Rather, the non-moving party must provide "sufficient evidence" for a jury to return a verdict in its favor. *Id.* "[I]f the [non-movant's] evidence is merely colorable or not significantly probative,

[then] summary judgment should be granted." *Id.* (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).


## III.    DISCUSSION

As a preliminary matter, the court must "look to the language of the policies themselves to determine in which instances they will provide coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 331 (2006). The court's primary goal in interpreting an insurance policy, as with interpreting any contract, is to ascertain the parties' intent as manifested by the policy's terms. *401 Fourth Street v. Investors Insurance Co.*, 583 Pa. 445, 454 (2005). "When the language of the policy is clear and unambiguous, [the] court is required to give effect to that language." *Id.* at 455. Alternatively, "[w]hen a provision in the policy is ambiguous . . . the policy is to be construed in favor of the insured to further the contract's [main] purpose of indemnification, [bearing in mind that] the insurer [primarily] drafts the policy and controls [its] coverage." *Id.*

The Policies at Issue are "occurrence-based" policies, meaning that coverage is implicated only when there has been an "occurrence," which is a contractual term with a meaning that has been refined through case law. *See,*

*e.g.*, *Kvaerner*, 589 Pa. at 324. Twenty-six out of the twenty-seven Policies at Issue define "occurrence" as "an accident, including continuous or repeated exposure to . . . conditions." (Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. H; Doc. 1, Exh. I; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. N; Doc. 1, Exh. P; Doc. 1, Exh. Q; Doc. 1, Exh. R; Doc. 1, Exh. S; Doc. 1, Exh. T; Doc. 1, Exh. V; Doc. 1, Exh. W; Doc. 1, Exh. X; Doc. 1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh. AA). The remaining policy defines "occurrence" as "injurious exposure, including continuous or repeated exposure to conditions." (Doc. 1, Exh. C). Each of the Policies at Issue links the definition of "occurrence" to "property damage," requiring the Defendant Insurers to pay for property damage "that takes place during the Policy Period and [that] is caused by an occurrence." (Doc. 182).

These contractual terms are unambiguous. "An occurrence . . . is an accident." *Kvaerner*, 589 Pa. at 332. Underpinning the idea of an "accident" is the concept that it must be "unexpected." *Id.* at 333. "It is [therefore] necessary . . . to examine whether the damage that [was] the impetus of [the Underlying Action] was caused by an accident [such that it] constitute[s] an occurrence" under one or more of the Policies at Issue. *Id.* at 332.

### a. Whether the Underlying Action Was an "Occurrence" Triggering the Defendant Insurers' Duty to Defend Sapa

The Pennsylvania Supreme Court has reiterated that the question of whether an insurer has undertaken the "duty to defend" (that is, the duty to defend an insured against a lawsuit) depends solely on "whether [the language of] the third party's complaint triggers coverage." *Mut. Benefit Ins. Co. v. Haver*, 555 Pa. 534, 538 (1999). The duty to defend is broader than the "duty to indemnify" (that is, the duty to indemnify the insured for liabilities sustained from a lawsuit), as the duty to defend is based upon allegations that, if proved, would trigger an indemnity obligation. *See id.* at 539 n.1. "If an insurer does not have a duty to defend, [then] it does not have a duty to indemnify." *Indalex Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 83 A.3d 418, 421 (Pa. Super. 2013), *app. denied*, 99 A.3d 926 (Pa. 2014). "However, both duties flow from a determination that the complaint triggers coverage." *Id.* (quoting *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (1997)).

To uncover whether the duty to defend exists in the instant dispute, therefore, the court must "examine [the] complaint to determine whether the allegations set forth therein constitute the type[s] of instances that will trigger coverage." *See, e.g.*, *Kvaerner*, 589 Pa. at 331 (holding that "[t]he Superior Court erred in looking beyond the allegations raised in [the] . . . [c]omplaint").

- 19 -

The existence of a duty to defend is determined "by comparing the four corners of the insurance contract to the four corners of the complaint." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 609 (2010). "The language of the policy and the allegations of the complaint must be construed together to determine the insurer's obligation." *Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 155 (2007) (quoting *Gene's Restaurant Inc. v. Nationwide Ins. Co.*, 519 Pa. 306, 308 (1988)). "It does not matter if . . . the facts [in the complaint] are completely groundless, false, or fraudulent." *Indalex*, 83 A.3d at 421 (quoting *D'Auria v. Zurich Ins. Co.*, 507 A.2d 857, 859 (Pa. Super. 1986)). "It is the face of the complaint, and not the truth of the facts alleged therein," that are of importance here. *Id.*

The question for analysis thus becomes whether any of Marvin's claims asserted in the Underlying Action qualified as covered "occurrences" such that they triggered the Defendant Insurers' duty to defend Sapa. The parties to the instant dispute cite to competing Pennsylvania court decisions to support their arguments on this point, and the court's disposition of this question in large part hinges upon the interpretation and application of these cases. (Doc. 182; Doc. 306). As such, a more thorough review of the reasoning undergirding the holdings of these cases is warranted.

### i. Review of the Applicable Case Law

At issue in *Kvaerner* was a damaged battery manufactured by the insured under specifications provided by the plaintiff in an underlying dispute. *See Kvaerner*, 589 Pa. at 335-36. According to this plaintiff, the insured breached its contract by supplying a product that did not comply with the required contractual specifications. *See id.* at 322. According to the insured, it was an improper movement of the battery's roof, either alone or in tandem with a heavy rainfall, that damaged the battery. *See id.* at 325. The insured sought coverage from its insurer under its occurrence-based, commercial general liability policy based on its contention that the damage was the result of an "accident" because the insured had not intended for its methods or the rainfall to move the battery's roof. *See id.* at 324.

The Pennsylvania Supreme Court found that the insurer was not obligated to provide coverage because the underlying lawsuit against the insured "aver[red] only property damage from poor workmanship to the work product itself." *Id.* at 336. The *Kvaerner* court reasoned that a commercial general liability policy may provide coverage where faulty workmanship causes bodily injury or damage to another property, but it does not cover cases where faulty workmanship damages the faulty work product alone. *See id.* at 334. Since faulty workmanship standing alone did not amount to an

"accident," there was no covered occurrence. *Id.* at 335-36. "[T]he ordinary definition of 'accident' . . . implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* at 333. The *Kvaerner* court further supported its holding by noting that the complaint in the underlying dispute contained only claims for breach of contract and warranty. *See id.* While "[t]he insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work [that are] defective or otherwise unsuitable because [they are] lacking in some capacity . . . [t]his liability . . . is not what the coverages in question are designed to protect against." *Id.* at 335 n.10. "The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Id.*

In *Gambone Bros.*, a number of homeowner-plaintiffs brought claims for breach of contract, breach of warranty, negligence, strict liability, fraud, and unfair trade practices against the insured, a builder of housing developments, in an underlying dispute. *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co., Inc.*, 941 A.2d 706, 710 (Pa. Super. 2007). Each of the plaintiffs had purchased homes in a development built by the insured, and their allegations centered on the use of defective stucco, which caused water damage and related problems to the interiors of the homes. *See id.* at 709. The insured

was denied coverage by its insurer, and the insurer thereafter sought a declaratory judgment stating that it did not owe said coverage. *See id.* The insured sought to distinguish *Kvaerner* on the basis that the underlying dispute did "not merely involve claims for faulty workmanship that led to the failure of the stucco exteriors but also involve[d] claims for ancillary and accidental damage caused by the resulting water leaks to non-defective work inside the home interiors." *Id.* at 713. The Superior Court of Pennsylvania, however, rejected this proposed distinction. *Id.*

Instead, the *Gambone Bros.* court viewed the resultant damage as affecting "the interior of the larger product, [which] in this case [was] the home," causing the case's facts to fall squarely under the holding in *Kvaerner*. *Id.* The damage to the homes' interiors that arose from defective workmanship on the homes' exteriors was therefore not an "occurrence." *Id.* The *Gambone Bros.* court elaborated that "natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused [from the beginning] by faulty workmanship . . . cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence-based [commercial general liability] policy." *Id.* Consequently, the *Gambone Bros.* court, applying *Kvaerner*, concluded that the insurer had no obligation to defend or indemnify the insured. *See id.*

In *Abbott Furnace*, the insured manufactured an annealing furnace that produced magnetic laminations for the plaintiff in an underlying dispute. *See Erie Ins. Exch. v. Abbott Furnace Co.*, 972 A.2d 1232, 1234 (Pa. Super. 2009). The malfunctioning furnace allegedly caused damages to both the furnace itself and the magnetic laminations, including some laminations that the plaintiff already had shipped to customers, resulting in various economic injuries. *Id.* The complaint in the underlying dispute brought claims for "breach of contract, breach of warranty, breach of the duty of good faith and fair dealing, fraud, and consumer fraud." *Id.* at 1235. The plaintiff was twice granted leave to amend its complaint, and the second amended complaint "includ[ed] a sixth count sounding in negligence." *Id.* After each iteration of the complaint, the insured sought coverage under its commercial general liability policy, which the insurer denied all three times. *See id.* The litigation ultimately resulted in a settlement agreement under which the insured agreed to pay the plaintiff. *See id.* The insurer thereafter filed a declaratory judgment action, claiming that the underlying pleadings did not establish an "occurrence" triggering coverage. *See id.* The insured argued that, because the underlying pleadings asserted negligence and claimed damages to property other than the annealing furnace itself, the case was distinguishable from *Kvaerner*, and coverage was due. *See id.* at 1236.

While the Superior Court of Pennsylvania agreed that the second amended complaint with the added negligence claim controlled the court's analysis, it further noted that "[w]hen a plaintiff alleges that a defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or [in] tort." *Id.* at 1238 (citing *Pa. Mfrs.' Ass'n Ins. Co. v. L.B. Smith, Inc.*, 831 A.2d 1178, 1182 (Pa. Super. 2003)). The *Abbott Furnace* court then held that the gist of the underlying pleadings against the insured lay in contract and that the underlying claim alleging negligence "arose from the mutual agreement between the parties regarding the specific requested purpose and design of the furnace." *Id.* at 1239. "[B]efore ordering a furnace from [the insured], [the plaintiff] advised [the insured] of its specific needs and intended use." *Id.* at 1240. "The damage to [the plaintiff's magnetic] laminations resulted from [the insured's] contractual breach in failing to design the furnace in accordance with [the plaintiff's] requested needs and intended use." *Id.*

In so holding, the *Abbott Furnace* court expressly rested its decision on a legal principle called the "gist of the action" doctrine and concluded that, although negligence had been included as a count in the second amended complaint, the negligence claim was not "adequately pleaded" to establish a

covered "occurrence." *Id.* at 1239. "As a practical matter, the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Id.* at 1238. "This is not a situation in which the tortious conduct was the 'gist' of the action and [in which] the contract was merely collateral to the conduct." *Id.* at 1239. "Accordingly, the claim should be limited to a contract claim because the parties' obligations are defined by the terms of the contract . . . not by the larger social policies embodied by the law of torts." *Id.* On that basis, the *Abbott Furnace* court affirmed the trial court's decision to rely on *Kvaerner* in granting summary judgment to the insurer. *See id.*

In arguing that the Underlying Action is indeed a covered occurrence, Sapa cites heavily to *Indalex*. (Doc. 182). In *Indalex*, the underlying dispute brought claims for "strict liability, negligence, breach of warranty, and breach of contract" based on allegations that the insured manufactured defective windows that resulted in water leakage and associated damage, including cracked walls, mold, and personal injury stemming from the mold. *Indalex*, 83 A.3d at 419. The insurer denied coverage on the basis that there was no "occurrence." *Id.* at 420.

The Superior Court of Pennsylvania first distinguished *Kvaerner* and *Gambone Bros.* by highlighting that the decisions to deny coverage in those cases were based primarily on the fact that the underlying complaints claimed

damage only to the allegedly faulty products themselves. *See id.* at 422-24.

For instance, since the *Gambone Bros.* decision involved a suit against "a

property developer and builder of homes, not a typical product manufacturer,

with the 'product' being the home itself," the underlying dispute in *Indalex*,

which was filed against a manufacturer of windows for damage to property

beyond the windows themselves, was distinct. *Id.* at 424. The *Indalex* court

then observed that, although the underlying complaint in *Abbott Furnace*

(unlike those in *Kvaerner* and *Gambone Bros.*) sought compensation for

damages to property other than the allegedly faulty property, the *Abbott*

*Furnace* decision instead focused on the inadequacy of the underlying

complaint in establishing a claim for negligence. *See id.* Since the "gist of the

action" was contract-based, the *Abbott Furnace* court held that the underlying

complaint was actually a contract claim for faulty workmanship masquerading

in tort's clothing. *See id.*

Concluding that the case before it was wholly distinguishable from

*Kvaerner*, *Gambone Brothers*, and *Abbott Furnace*, the *Indalex* court held that

"the claims against [the insured] . . . involved product-liability-based tort

claims." *Id.* at 425. "Simply stated, because [the insured sought coverage for]

tort claims based on damages to persons or property other than the insured's

product," the claims were within "the scope of the coverage," and the insurer

was "obligated to defend" the insured. *Id.* "[T]he most critical element in *Indalex* was that the [underlying] claims were product-liability tort claims that were based on damages to persons or property other than the insured's product." *Hagel v. Falcone*, 2014 WL 8331846, at *12 (Pa. Super. Dec. 23, 2014). In other words, the "provisions of a [commercial] general liability policy provide coverage . . . if the insured work or product *actively malfunctions*, causing injury to an individual or damage to another's property." *Kvaerner*, 589 Pa. at 333 (emphasis in original).

Turning now to the instant coverage dispute pending before this court, much of the parties' disagreement stems from the interplay between *Indalex* and the line of cases originating with *Kvaerner*. (Doc. 151; Doc. 182; Doc. 185; Doc. 192; Doc. 211; Doc. 306). Sapa argues that *Indalex* controls this case's outcome because the Underlying Action asserted tort-based claims for product defects that resulted in damage to additional property beyond the defective extrusions. (Doc. 182; Doc. 244; Doc. 259). Conversely, the Defendant Insurers argue that *Kvaerner* controls because the Underlying Action brought only claims for faulty workmanship resulting only in damage to the faulty extrusions themselves. (Doc. 151; Doc. 185; Doc. 192; Doc. 211; Doc. 306). It is undisputed that the legal calculus established through Pennsylvania case law hinges on the nature of the causes of action and

damages alleged in the Underlying Action, in conjunction with the language of the specific Policies at Issue.

### ii. The Claims Pled in the Underlying Action

Marvin's complaint in the Underlying Action brought claims for breach of contract, breach of express warranty, breach of implied warranty, fraud, fraudulent concealment, negligent misrepresentation, and unlawful trade practices. (Doc. 1, Exh. A). First, Marvin's underlying claims for breach of contract and breach of warranty are easily resolved. "Contractual claims of poor workmanship [do] not constitute the active malfunction needed to establish coverage." *Kvaerner*, 589 Pa. at 333. As noted above, Pennsylvania courts have consistently rejected coverage under occurrence-based insurance policies for damage to the insured's work product itself flowing from the insured's failure to provide a product that meets contractual specifications. *See id.* In other words, "it is largely within the insured's control whether it supplies the agreed-upon product, and the fact that contractual liability flows from the failure to provide that product is too foreseeable to be considered an accident." *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 596 (3d Cir. 2009). These claims thus do not trigger the Defendant Insurers' duty to defend Sapa.

Marvin's underlying claims for fraud and fraudulent concealment meet a similar fate. Each variant of fraud alleged in Marvin's complaint "require[s] a demonstration of intentional action, which takes the incidents out[side] the scope of the defined term 'occurrence.' " *Bituminous Cas. Corp. v. John W. Gleim, Jr., Inc.*, 2009 WL 473034, at *6 (M.D. Pa. Feb. 24, 2009) (holding that fraud is not an occurrence and granting summary judgment to the insurer). "Intentional acts, in contrast to accidents, are not covered 'occurrences' under a general liability policy." *Tower Ins. Co. v. Dockside Assocs. Pier 30 LP*, 834 F. Supp. 2d 257, 263 (E.D. Pa. 2011) (citing *Sclabassi v. Nationwide Mut. Fire Ins. Co.*, 789 A.2d 699, 703 (Pa. Super. 2001)). Due to their inherent intent requirements, claims for fraud and fraudulent concealment, without more, are not encompassed within the definition of "occurrence," which Pennsylvania case law has construed as something accidental. *Am. Planned Cmtys., Inc. v. State Farm Ins. Co.*, 28 F. Supp. 2d 964, 968 (E.D. Pa. 1998). As such, these claims do not trigger the Defendant Insurers' duty to defend Sapa.

Nor does Marvin's underlying claim for negligent misrepresentation amount to a covered occurrence. (Doc. 1, Exh. A). In *Maier*, the Superior Court of Pennsylvania confronted this precise issue and found that the addition of a claim for negligent misrepresentation in an underlying complaint does not trigger an insurer's duty to defend. *Erie Ins. Exch. v. Maier*, 963 A.2d

907, 909 (Pa. Super. 2008). The *Maier* court first recounted the elements of a claim for negligent misrepresentation under Pennsylvania law and observed that one of those elements requires an "intent for another person to rely on the misrepresentation." *Id.* at 910 (citing *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 466 (2005)). "[T]he claim of negligent misrepresentation . . . contains an element of specific intent, which takes the claim outside the realm of the unintentional." *Id.* Since "intentional acts are not occurrences . . . there is no coverage." *Id.* at 909-10. *See also Westfield Ins. Co. v. Rustic Exteriors, Inc.*, 2013 WL 12146532, at *5 n.7 (E.D. Pa. Mar. 21, 2013) (noting that "[t]hough the underlying complaint also alleges 'negligent misrepresentation' . . . the substance of th[is] claim fails to trigger policy coverage because [it is] not [an] accident-based 'occurrence' ").

The *Maier* court supported this holding by noting that "the underlying . . . complaint alleges that [the insured had] specific knowledge of the falsity of [its] statement[s]." *Maier*, 963 A.2d at 910. The very same is true of Marvin's complaint in the Underlying Action, which contains similar allegations of intent throughout. (Doc. 1, Exh. A). For instance, numbered paragraph fifteen of Marvin's complaint states that "[a]s Sapa intended, Marvin elected to purchase and use Sapa's products in reliance upon the representations, warranties, and agreements supplied by Sapa." (*Id.*). Numbered paragraph nineteen states

that "Sapa knew that some of its products manufactured for Marvin did not meet Marvin's specifications . . . and concealed these facts from Marvin." (*Id.*). Numbered paragraph twenty-one states that "[t]hese representations were false because, as Sapa knew, Sapa's products manufactured for Marvin had not been produced using standard operating procedures." (*Id.*). Numbered paragraphs sixty-one, sixty-three, seventy-two, seventy-three, seventy-four, and eighty-one each contain similar allegations of intent. (*Id.*). "This makes the claim as found in the [underlying] complaint more akin to intentional misrepresentation." *Maier*, 963 A.2d at 910. "Thus, we are faced with allegations, although generally labeled as 'negligent misrepresentation,' which actually go to specific and intentional actions and results." *Id.* at 909. Therefore, Marvin's allegation of negligent misrepresentation does not constitute an "occurrence" as required by the Policies at Issue. (Doc. 60).

Similarly, Marvin's allegation of unlawful trade practices is not an occurrence. (Doc. 1, Exh. A). Marvin's unlawful trade practices claim arose under a Minnesota state statute stating that "[n]o person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients, or origin of such merchandise." Minn. Stat. Ann. §325D.13. Here too, the requirement for a violator to "knowingly misrepresent" the contents of sold merchandise "takes the claim outside the realm of the

unintentional." *Maier*, 963 A.2d at 910. Consistent with this finding is a host of decisions from courts within the Third Circuit holding that underlying claims of unlawful trade practices do not trigger coverage under occurrence-based policies. *See, e.g.*, *Quality Stone Veneer, Inc. v. Selective Ins. Co. of Am.*, 229 F. Supp. 3d 351, 364 (E.D. Pa. 2017); *Westfield Ins. Co. v. Bellevue Holding Co.*, 856 F. Supp. 2d 683, 689 (E.D. Pa. 2012); *Meridian Mut. Ins. Co. v. James Gilligan Builders*, 2009 WL 1704474, at *6 (E.D. Pa. June 18, 2009).

Contrary to Sapa's assertions, therefore, Marvin's complaint in the Underlying Action falls outside the ambit of *Indalex*. (Doc. 1, Exh. A; Doc. 182). While the underlying dispute in *Indalex* brought claims for strict liability and negligence, the Underlying Action "has an explicit basis in contract" and does not set forth any tort claims premised on product liability. *Bellevue Holding Co.*, 856 F. Supp. 2d at 698. Stated differently, while the factual averments from the underlying complaint in *Indalex* were phrased in terms of a "bad product [that] . . . 'active[ly] malfunction[ed]' . . . not merely bad workmanship," Marvin's complaint instead "allege[s] faulty workmanship, which cannot constitute an occurrence" under the Policies at Issue. *Indalex*, 83 A.3d at 424; *Quality Stone Veneer, Inc.*, 229 F. Supp. 3d at 361. The Underlying Action does not describe the "active malfunction" contemplated by the *Indalex* court because the allegedly faulty extrusions originated from

Sapa's contractual breach and not by virtue of some accidental or surprise defect. (Doc. 1, Exh. A). Any claim that Sapa acted negligently "arose from the mutual agreement between the parties regarding the specific requested purpose and design of the [extrusions]." *Abbott Furnace Co.*, 972 A.2d at 1239. Indeed, the District of Minnesota in the Underlying Action expressly stated that "Sapa owed Marvin no extra-contractual duty of care." *Marvin Lumber & Cedar Co.*, 964 F. Supp. 2d at 1006. Before ordering extrusions from Sapa, Marvin "advised [Sapa] of its specific needs and intended use." *Id.* at 1240. "The damage . . . resulted from [the insured's] contractual breach in failing to design the [extrusions] in accordance with [the plaintiff's] requested needs and intended use." *Id.* The parties' obligations were thus "defined by the terms of the contract," as opposed to the broader "social policies embodied by the law of torts." *Id.* at 1239. "Undoubtedly, any claims arising out of this contractual duty cannot, pursuant to well-established Pennsylvania law, constitute 'occurrences' for purposes of coverage." *Bellevue Holding Co.*, 856 F. Supp. 2d at 698.

### iii. The Damages Pled in the Underlying Action

Equally telling in this regard are Marvin's claimed damages in the Underlying Action. (Doc. 1, Exh. A). In their briefs, the parties appear to

dispute whether Marvin sought compensation for damage to external property surrounding Sapa's extrusions (the so-called "interior refinish" costs). (Doc. 214; Doc. 253). Specifically, Sapa attempts to argue that coverage is due because the Underlying Action alleged damage to external property beyond the faulty extrusions themselves. (Doc. 182). However, a closer examination of the evidentiary record indicates otherwise; there is no genuine dispute of material fact on this point such that it would preclude the entry of summary judgment. (Doc. 1, Exh. A).

Marvin sought as damages the costs of "investigating and responding to" consumer complaints, "identifying and qualifying alternative" extrusion suppliers, "repairing" and "replacing" the failed extrusions, rebuilding its "valuable reputation," and experiencing lost "sales and profits." (*Id.*). While Sapa contends that Marvin also expended costs repairing property surrounding the faulty extrusions, it ultimately concedes that Marvin's complaint in the Underlying Action, which controls this court's analysis, never set forth a specific category of damages related to "interior refinish" costs. (Doc. 253; Doc. 335; Doc. 343). In fact, the closest that Marvin comes to referencing harm to any additional property beyond Sapa's own products is its statement that "[t]o date, Marvin has expended in excess of $75,000 in repairing and . . . replacing Sapa's . . . extru[sions] . . . which have

experienced surface cracking, checking, peeling, and . . . loss of adhesion in installations in the field." (Doc. 1, Exh. A). Even here, however, Marvin's complaint plainly states that the damage was caused to the extrusions themselves. (*Id.*). This brings the case even further beyond the scope of *Indalex*, where defective windows and doors caused direct damage to external property by permitting water leakage that resulted in mold damage and bodily injury. *Indalex*, 83 A.3d at 419.

Further foreclosing Sapa's contention is the Pennsylvania Superior Court's *Gambone Bros.* decision, where the court explained that any "natural and foreseeable acts . . . which tend to exacerbate the damage, effect, or consequences caused [from the beginning] by faulty workmanship . . . cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' [under] an occurrence-based [commercial general liability] policy." *Gambone Bros. Dev. Co.*, 941 A.2d at 713. In the instant dispute, it was plainly natural and foreseeable to expect that cracking and peeling window extrusions may need replacing and, as a result, may damage the surrounding drywall and wall fixtures during the replacement process. (Doc. 253). Since the failed window extrusions were initially caused by Sapa's faulty workmanship, the mere fact that additional damages subsequently flowed from the costly and disruptive repair process does not suddenly transform this non-occurrence into an

occurrence. (Doc. 214). Had Marvin specifically pled damages to additional property in the Underlying Action, the outcome here may have differed, but where "[t]he underlying suit . . . avers only damage from poor workmanship to the work product itself," there is no covered occurrence. *Id.* at 336. Accordingly, Marvin's complaint in the Underlying Action does not trigger the Defendant Insurers' duty to defend Sapa based on the "occurrence" provisions of the Policies at Issue.

### b. Products-Completed Operations Hazard

The "products-completed operations hazard" provisions are separate provisions in many of the Policies at Issue that function as either express exclusions from coverage or exceptions to express exclusions from coverage. "Products-completed operations hazard" is defined in the Policies at Issue as "property damage occurring away from premises [the insured] own[s] or rent[s]" that arises out of "[the insured's] product" or "[the insured's] work," except "products that are still in [the insured's] physical possession" or "work that has not yet been completed or abandoned." (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. P; Doc. 1, Exh. Q; Doc. 1, Exh. X; Doc. 1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh. AA). Sapa contends that these

"products-completed operations hazard" provisions, when read together with the "occurrence" language in the Policies at Issue, give the court good reason to find that the Underlying Action is indeed an occurrence. (Doc. 182). Specifically, Sapa asserts that the "products-completed operations hazard" affirmatively grants coverage for "[the insured's] work," which is defined to include "[w]arranties" about the "fitness . . . of [the insured's] work." (*Id.*). This argument, however, is unsupported by the language and structure of the Policies at Issue because the inclusion of products-completed operations hazard coverage does not alter the overarching "occurrence" requirement.

Without variation, each of the Policies at Issue begins with a section (entitled either "[c]overage" or "[c]overages") defining the overall scope of coverage and mandating that coverage must stem from an "occurrence."[3] (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. P; Doc. 1, Exh. Q; Doc. 1, Exh. X; Doc. 1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh.

---

[3] The only Policies at Issue that do not directly contain the "occurrence" language are several umbrella and excess liability policies that "follow [the] form" of their respective underlying commercial general liability policies and thus incorporate the "occurrence" language by reference. (Doc. 1, Exh H; Doc. 1, Exh. I; Doc. 1, Exh. N; Doc. 1, Exh. R; Doc. 1, Exh. S; Doc. 1, Exh. T; Doc. 1, Exh. V; Doc. 1, Exh. W).

AA). The "occurrence" requirement is paramount, and it illuminates the reminder of the language in the Policies at Issue.

The "products-completed operations hazard" provisions, by contrast, appear most commonly under the sections of the Policies at Issue entitled "[e]xclusions" from coverage. (Doc. 1, Exh. E). In some of the Policies at Issue, the "products-completed operations hazard" provisions function as direct exclusions from coverage, meaning that any circumstances that would otherwise amount to covered occurrences are nonetheless excluded from coverage if the definition of "products-completed operations hazard" applies. For example, many of the Policies at Issue state that "[t]his insurance does not apply to . . . '[p]roperty damage' to '[the insured's] work' arising out of it or any part of it and included in the 'products-completed operations hazard' [provisions]." (Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G). Under these policies, Sapa's argument is clearly without merit. In other words, if circumstances meeting the definition of "products-completed operations hazard" are expressly excluded from coverage, then such language cannot, as Sapa implies, operate as an affirmative grant of coverage. *See Wenzel v. Nautilus Ins. Co.*, 474 F. App'x 862, 864 (3d Cir. 2012) (stating that "[t]he products completed-operations hazard provision . . . stands as a limitation to [coverage], not an affirmative grant of coverage").

Other Policies at Issue incorporate the "products-completed operations hazard" language slightly differently—as exceptions to express exclusions from coverage. For example, certain Policies at Issue state that "this exclusion does not apply to 'property damage' included in the 'products-completed operations hazard' [provisions]." (Doc. 1, Exh. J). Under these policies, circumstances that ordinarily would not be covered due to the applicability of an express exclusion from coverage can nonetheless become covered if the damage fits within the definition of "products-completed operations hazard." (*Id.*). In these situations, even though the "products-completed operations hazard" provisions do have the potential to provide coverage through the operation of an exception to an express exclusion from coverage, this does not negate the broader "occurrence" requirement. *See, e.g.*, *Quality Stone Veneer, Inc.*, 229 F. Supp. 3d at 364. Stated differently, there must first be an "occurrence" triggering coverage for any express exclusions from coverage to take effect, so there must also be an "occurrence" triggering coverage for any exceptions to those exclusions to take effect. Since an exclusion from coverage can only apply if there was an occurrence, an exception to an exclusion from coverage similarly requires an occurrence. There can be no "exception" without an "exclusion" and no "exclusion" without an "occurrence." *See Hagel*, 2014 WL 8331846, at *14.

The court in *Rustic Exteriors* confronted this identical issue. *Rustic Exteriors, Inc.*, 2013 WL 12146532, at *7-8. There, the court held that the insurer had no duty to defend the insured because there was no "occurrence" as defined in the policy. *Id.* at *7. In so holding, the court rejected the insured's reliance on the "products-completed operations hazard" language. *Id.* "[T]he plain, unambiguous language of the 'products-completed operation hazard' read in the context of the policy as a whole . . . does not alter the 'occurrence' coverage-triggering requirement in the policy but merely clarifies what 'property damage' may be covered under the policy in certain circumstances." *Id.* The mere existence of the products-completed operations hazard did "not change the fact that, under the policy, the covered 'property damage' (of which the 'products-completed operations hazard' is a part) must be 'caused by' an accident-based 'occurrence.' " *Id.* at *8.

"A reading of the entire policy reveals that the 'products-completed operations hazard' is subject to the . . . coverage limitations and, therefore, [is] subject to the 'occurrence' requirement." *Quality Stone Veneer, Inc.*, 229 F. Supp. 3d at 364. As the "products-completed operations hazard" language is neither structured nor intended to grant Sapa any additional, substantive coverage, Sapa's argument on this point falls short. "Since we have already concluded that there is no 'occurrence' here, [Sapa's] 'products-completed

- 41 -

operations hazard' argument does not cure this fatal and dispositive flaw." *Rustic Exteriors, Inc.*, 2013 WL 12146532, at *8. These provisions merely refine the scope of an "occurrence" by defining particular ways in which a situation that already qualifies as an "occurrence" can be either removed from coverage or excepted from removal from coverage. They do not grant additional coverage independent of the "occurrence" requirement. *See id.* "Absent a winning argument on that point, we must conclude that any such coverage in this occurrence-based policy is precluded for the same reasons set forth [above]." *Hagel*, 2014 WL 8331846, at *14. *See also Gambone Bros. Dev. Co. Inc.*, 941 A.2d at 715 (holding that "[t]he fatal flaw in [the insured's] argument is that if we were to accept its interpretation of the [products-completed operations hazard] . . . we would be forced to render the definition of 'occurrence' mere surplusage").

Finally, the term "products-completed operations hazard" can be located in some of the Policies at Issue under certain sections entitled "[l]imits of [i]nsurance." (Doc. 1, Exh. K). Here, the Policies at Issue provide different aggregate limits of coverage depending on the type of damages caused. (*Id.*). "[T]he separate aggregate limits for . . . [the] 'products-completed operations hazard' [provisions] simply reflect the policy's intent to bifurcate coverage between damages that occur on [the insured's] own property versus damages

that occur away from [the insured's] property." *Quality Stone Veneer, Inc.*, 229 F. Supp. 3d at 364. "Under either situation, the damages must be the result of an 'occurrence' . . . to trigger coverage." *Id.* at 364. Therefore, contrary to Sapa's assertions, "the broad language in the products-completed [operations hazard] provision[s] does not change the fact that there still must be an 'occurrence' . . . for any . . . coverage to apply." *Id.* at 363.

### c. The Insured Contract Provisions

This "insured contract" language in the Policies at Issue forms the next argument to which Sapa turns in its attempt to argue that coverage is due. (Doc. 182). Several of the Policies at Issue either include or incorporate by reference certain "insured contract" provisions. (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. X; Doc. 1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh. AA). An "insured contract" is defined in relevant part under the Policies at Issue as a "contract or agreement pertaining to [the insured's] business . . . under which [the insured] assumes the tort liability of another party to pay for . . . 'property damage' to a third person or organization." (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. X; Doc.

1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh. AA). "Tort liability" is defined as "liability that would be imposed by law in the absence of any contract or agreement." (Doc. 1, Exh. AA).

### i. The Language in the Policies at Issue Is Not Structured to Compel Any Coverage Obligations Under the "Insured Contract" Provisions

The "insured contract" provisions are used in at least three separate contexts in the Policies at Issue, none of which are sufficiently structured or intended to trigger the Defendant Insurers' coverage obligations. The first of these contexts occurs where the insured contract provisions function as exceptions to express exclusions from coverage. Here, the occurrence-based Policies at Issue state that "[t]his insurance does not apply to . . . [c]ontractual liability" and further state that the contractual liability "exclusion does not apply to liability for damages . . . [a]ssumed in a contract or agreement that is an 'insured contract.' " (Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. Z). In a manner similar to the products-completed operations hazard provisions explained above, even though the "insured contract" provisions do have the potential to provide coverage through the operation of exceptions to express exclusions from coverage, this does not negate the broader

"occurrence" requirement. *See, e.g.*, *Quality Stone Veneer, Inc.*, 229 F. Supp. 3d at 364. Since an exclusion from coverage can only apply if there was an occurrence, an exception to an exclusion from coverage likewise requires an occurrence before it can take effect.

A similar logic applies to those portions of the Policies at Issue that incorporate the "insured contract" language into the provisions defining the overall scope of coverage. Here, the Policies at Issue state that the Defendant Insurers "will pay . . . those sums . . . that the [i]nsured becomes legally obligated to pay . . . under an [i]nsured [c]ontract because of . . . [p]roperty [d]amage . . . caused by an [o]ccurrence happening anywhere in the world." (Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G). A functionally equivalent construction exists in those Policies at Issue stating that the Defendant Insurers will "pay . . . all sums [that] the insured shall become legally obligated to pay as damages because of . . . property damage . . . caused by an occurrence and arising out of . . . liability assumed under an 'insured contract.' " (Doc. 1, Exh. C). In both instances, the unambiguous policy language indicates that the "property damage" must be "caused by an occurrence" before the insurer must pay. (*Id.*). In this context, the insured's assumption of liability under an "insured contract" is only one piece of the coverage-triggering requirements; without an "occurrence," the "insured

contract" language is meaningless. (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G).

The final context in which the "insured contract" language appears arises under certain sections of the Policies at Issue entitled "supplementary payments." (Doc. 1, Exh M; Doc. 1, Exh. X; Doc. 1, Exh. Y). Here, the Policies at Issue state in relevant part that "[i]f [the insurer] defends [the insured] against a 'suit' and an indemnitee of the insured is also named as a party to the 'suit,' [then the insurer] will defend that indemnitee if all of the following conditions are met . . . (a) [t]he 'suit' against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in . . . an 'insured contract . . . (b) [t]his insurance applies to such liability assumed by the insured . . . [and] (c) [t]he obligation to defend . . . that indemnitee has also been assumed . . . in the same 'insured contract.' " (Doc. 1, Exh. Y).

The plain language of the Policies at Issue specifies that the "supplementary payments" provisions are triggered only in expressly defined circumstances that are not present here. (*Id.*). In fact, these "supplementary payments" provisions are wholly inapplicable to the facts before this court. (*Id.*). Under a standard "supplementary payments" provision in a commercial general liability insurance policy, the insurer has no obligation if no defense obligation ever existed; the supplementary payments provision applies only to

those cases where the insurer actually owed a duty to defend. (*Id.*). As the Defendant Insurers owed no duty to defend Sapa, it precludes any finding that the "insured contract" language in the "supplementary payments" provisions triggers any additional coverage obligations. (Doc. 1, Exh M; Doc. 1, Exh. X; Doc. 1, Exh. Y).

### ii. The Facts of the Underlying Action Do Not Amount to an "Insured Contract"

Moreover, the facts and circumstances surrounding the Underlying Action do not indicate that Sapa ever "assume[d] the tort liability of another party to pay for . . . 'property damage' to a third person or organization," as would be necessary to implicate the "insured contract" language. (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. X; Doc. 1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh. AA). The definition of "insured contract" would be satisfied only if Sapa undertook some obligation to pay claims to Marvin's customers even "in the absence of [a] contract or agreement" with Marvin. (Doc. 1, Exh. AA). Sapa argues that its liability to Marvin in the Underlying Action was based on an "insured contract" because Sapa was contractually required to indemnify Marvin for tort liability to Marvin's consumers. (Doc.

182). As evidence for this assertion, Sapa cites only to the opinion of the District of Minnesota ruling on summary judgment in the Underlying Action. (Doc. 296). Specifically, Sapa points out that the District of Minnesota, finding that a genuine issue of material fact existed on Marvin's underlying claim for contribution or indemnity, stated that "Marvin has proffered evidence suggesting the parties had an agreement [that] Sapa would indemnify Marvin for expenses incurred as a result of defects in Sapa's products." *Marvin Lumber & Cedar Co.*, 964 F. Supp. 2d at 1010.

In the Underlying Action, Marvin sought reimbursement for the cost of repairing and replacing Sapa's faulty aluminum extrusions, which were incorporated into Marvin's aluminum-clad products and sold to Marvin's customers. *See id.* at 996-97. As the District of Minnesota noted in the Underlying Action, Marvin's assertion of damages was exclusively related to its voluntarily assumed obligations to its customers through the warranty that it issued with its products. *See id.* at 1006. In its summary judgment ruling, the District of Minnesota observed that "[w]hile *Marvin* may be liable to its customers under a warranty it issued to them, it has established no theory under which *Sapa* could be liable to Marvin's customers." *Marvin Lumber & Cedar Co.*, 964 F. Supp. 2d at 1009 (emphasis in original). "Thus, Marvin and Sapa are not jointly liable to a third party, and Sapa has no duty of

contribution." *Id.* Finding that Marvin's liability to its customers was based solely on its warranty obligations, the District of Minnesota held that Sapa "was not vicariously liable to Marvin's customers." *Id.* at 1010. Rather, "to establish a right to indemnification, Marvin [had to] show that Sapa expressly agreed to indemnify it." *Id.* Ultimately, the court permitted Marvin's indemnification claim to proceed forward under a contract theory because the record included several statements that Sapa had orally agreed to indemnify Marvin for its warranty liability. *See id.*

Turning again to the Policies at Issue, the limited definition of an "insured contract" as one assuming another party's "tort liability"—defined as "liability that would be imposed by law in the absence of any contract or agreement"—does not apply to the facts at hand. (Doc. 1, Exh. C; Doc. 1, Exh. D; Doc. 1, Exh. E; Doc. 1, Exh. F; Doc. 1, Exh. G; Doc. 1, Exh. J; Doc. 1, Exh. K; Doc. 1, Exh. L; Doc. 1, Exh. M; Doc. 1, Exh. X; Doc. 1, Exh. Y; Doc. 1, Exh. Z; Doc. 1, Exh. AA). Marvin's sole means of prevailing on its indemnification claim was to establish that Sapa actually agreed to indemnify Marvin, so by its very nature, Sapa's liability to Marvin could not exist "in the absence of [a] contract or agreement." (Doc. 1, Exh. AA).

This outcome comports well with established Pennsylvania law, which demarcates a hard boundary between causes of action sounding in tort and

those sounding in contract. *See, e.g.*, *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (citing *REM Coal Co. v. Clark Equipment Co.*, 563 A.2d 128, 134 (Pa. Super. 1989)). Pennsylvania courts have consistently refused to adopt constructions that would transform commercial general liability insurance policies, "which [are] intended to insure against accidents," into performance bonds, "which guarantee the work." *Kvaerner*, 908 A.2d at 899. In asking this court to hold the Defendant Insurers liable under the "insured contract" provisions, Sapa is essentially asking the Defendant Insurers to provide coverage for Sapa's voluntarily assumed guarantee of Marvin's own voluntarily assumed contractual liability to its customers. (Doc. 216). Such a theory has no basis under Pennsylvania law, and it would fundamentally distort the purpose of commercial general liability policies.

Finally, Sapa has failed to set forth an adequate evidentiary basis upon which this court could grant its desired ruling. As noted, the sole "evidence" Sapa offers in support of its "insured contract" argument consists of the District of Minnesota's summary judgment opinion. (Doc. 296). However, the District of Minnesota's determination that Marvin had created a triable issue of fact regarding its indemnity claim does not, on its own, create a triable issue of fact in *this* case as to whether such an agreement existed. To the contrary, the District of Minnesota's decision is inadmissible hearsay with respect to Sapa's

purpose of establishing the existence of an indemnification agreement with Marvin. *See Int'l Land Acquisitions, Inc. v. Fausto*, 39 Fed. App'x 751, 756 (3d Cir. 2002) (stating that "the opinion is an out of court statement offered for the truth of the matter asserted"); *Trs. of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 905-06 (3d Cir. Pa. 1987) (noting the inapplicability of Fed. R. Evid. 803(8)'s hearsay exception for public records to judicial decisions). "It is well-established that evidence that would be inadmissible at trial is inadmissible when deciding a motion for summary judgment." *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 450 (M.D. Pa. 2013). Accordingly, the Defendant Insurers did not undertake any duty to defend Sapa in the Underlying Action.

### d. The Defendant Insurers' Alleged Duty to Indemnify Sapa in the Underlying Action

"If an insurer does not have a duty to defend, [then] it does not have a duty to indemnify." *Indalex*, 83 A.3d at 421. "[O]nce a court finds that there is no duty to defend, it must necessarily hold that there is no duty to indemnify either." *Bellevue Holding Co.*, 856 F. Supp. 2d at 702. "Although similar, the duty of an insurer to indemnify is somewhat more limited than its duty to defend." *Britamco Underwriters, Inc. v. C.J.H., Inc.*, 845 F. Supp. 1090, 1094 (E.D. Pa.), *aff'd*, 37 F.3d 1485 (3d Cir. 1994). "However, both duties flow from

a determination that the complaint triggers coverage." *Indalex*, 83 A.3d at 421. "[T]he duty to indemnify . . . arises only if it is established that the insured's damages are actually covered by the terms of the policy." *Allstate Ins. Co. v. Drumheller*, 185 F. App'x 152, 154 n.2 (3d Cir. 2006). In other words, the Defendant Insurers "must indemnify [Sapa] only if liability is found for conduct that actually falls within the scope of the [Policies at Issue]." *Britamco*, 845 F. Supp. at 1094.

This court's examination of Marvin's complaint in the Underlying Action has revealed that the "allegations set forth therein" did not "constitute the type[s] of instances that . . . trigger coverage" under the Policies at Issue. *Kvaerner*, 589 Pa. at 331. The facts alleged in Marvin's complain do not amount to an "occurrence." (Doc. 1, Exh. A). Nor are various supplemental provisions in the Policies at Issue—such as the "products-completed operations hazard" provisions and the "insured contract" provisions—sufficient to trigger coverage. As the Defendant Insurers had no duty to defend Sapa in the Underlying Action, they consequently have no duty to indemnify Sapa.

### e. Applicability of Various Insurance Coverage Trigger Theories

The parties to the instant dispute spend considerable portions of their briefs addressing which "trigger theory" of insurance coverage that they

believe applies to the situation at hand and dictates which Policies at Issue are implicated. Coverage was not triggered under any of the twenty-eight occurrence-based Policies at Issue, so the court does not reach the question of which trigger theory applies to the instant dispute.

### f. Allocation of Damages

The parties have also briefed the issue of whether Sapa forfeited its coverage under the Policies at Issue by failing to equitably allocate its damages arising from the Underlying Action between covered claims and uncovered claims at the time of settlement. Coverage was not triggered under any of the twenty-eight occurrence-based Policies at Issue, so the court does not reach the question of whether Sapa has satisfied its burden of proving which damages were covered.

## IV. CONCLUSION

In light of the foregoing, Sapa's pending motion for partial summary judgment, (Doc. 181), will be **DENIED**. Gerling's pending motion for summary judgment, (Doc. 150), will be **GRANTED**. Liberty Mutual's pending motion for summary judgment, (Doc. 178), will be **GRANTED**. Great American's pending motion for summary judgment, (Doc. 185), will be **GRANTED**. Arch's pending

motion for summary judgment, (Doc. 187), will be **GRANTED**. National Union and ICSOP's pending joint motion for summary judgment, (Doc. 191), will be **GRANTED**. Pacific and ACE American's pending joint motion for summary judgment, (Doc. 197), will be **GRANTED**. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: May 1, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-2827-04.docx